```
 1              IN THE UNITED STATES DISTRICT COURT

 2                   DISTRICT OF CONNECTICUT

 3       _____

 4                                 )
         JOHN DOE,                  )
 5                                  )
              Plaintiff,            )
 6                                  )
         Vs.                        )  Case No. 3:00
 7                                  )  CV-01096 (SRU)
                                    )
 8       UNUM PROVIDENT CORPORATION )
         f/k/a PROVIDENT COMPANIES  )
 9       INC. THE PAUL REVERE LIFE  )
         INSURANCE COMPANY, PROVIDENT )
10       LIFE AND ACCIDENT INSURANCE )
         COMPANY OF AMERICA AND     )
11       JOHN HANCOCK MUTUAL LIFE   )
         INSURANCE,                 )
12                                  )
              Defendants.           )
13       _____

14

15           The deposition of GREG BRETER, called as a

16      witness at the instance of the Defendant, for evidence

17      and/or discovery, under the Federal Rules of Civil

18      Procedure, on the 11th of February, 2003, in the

19      Conference Room of The Country Inn & Suites,

20      Chattanooga, Tennessee, in the presence of:

21

22

23

24              JEANNIE BOLEMAN, CSR, RPR
                ACCURATE COURT REPORTERS
                      813 KAY CIRCLE
25              CHATTANOOGA, TN 37421
                    (423) 954-3565
                                                    1
```

```
 1      APPEARANCES:

 2              JONATHAN KATZ, ATTORNEY AT LAW
                Jacobs, Grudberg, Belt & Dow, P.C.
 3              350 Orange Street
                P.O. Box 606
 4              New Haven, CT 06503

 5              Appearing for the Plaintiff

 6
                ERIN K. O'BRIEN, ATTORNEY AT LAW
 7              Robinson & Cole, LLP
                280 Trumbull Street
 8              Hartford, CT 06103-3597

 9              Appearing for the Defendant

10      _____

11          Deposition is being taken by agreement of

12      counsel for the Plaintiff and the Defendant. It is

13      agreed that the deposition shall be taken in machine

14      shorthand by Jeannie Boleman, Certified Shorthand

15      Reporter, Registered Professional Reporter and Notary

16      Public, that the signature of the witness to the

17      completed deposition is not waived, and that the

18      witness may be sworn by the said Notary Public.

19          It is further agreed that all formalities as

20      to caption, notice, certificate and mode of

21      transmission are waived, and that the deposition is

22      taken subject to the usual exceptions as to

23      irrelevancy, incompetency and immateriality, which are

24      reserved to the hearing of the cause, except as to the

25      form of the question.
```

1  information. Do you know what information you were
2  expecting to receive from Ms. Brissette?
3    A.  I don't recall specifically at this time what
4  that was, no.
5    Q.  Okay.  And it says will plan to call you
6  after round table?
7    A.  Correct.
8    Q.  What's a round table?
9    A.  Round table is a multi-disciplinary resource
10  that's available to claim specialists, usually
11  attended by medical resources, legal resources,
12  underwriting resources, physicians in which further
13  direction can be obtained and a review and evaluation
14  of any specific claim.
15    Q.  Is it a meeting?
16    A.  Pardon?
17    Q.  Is it a meeting?
18    A.  It is a meeting, yes.
19    Q.  Okay.  And it's attended by people who come
20  to discuss a particular claim?
21    A.  Correct.
22    Q.  And was Dr. Simon's claim the subject of one
23  of these meetings?
24    A.  As it appears in the file, yes.
25    Q.  All right.  And if you look at Deposition

52

1    A.  That's correct.
2    Q.  Did you have your files with you?
3    A.  Yes.
4    Q.  Did you prepare any summary sheet or work-up
5  to be distributed to the people who attended the round
6  table so that they would know what Dr. Simon's claim
7  was about?
8    A.  The only summary work sheet basically
9  contained policy information, the occupation, date of
10  disability, diagnosis, age, specific restrictions and
11  limitations.  That would be it -- about it.
12    Q.  Do you have it?
13    A.  No, that was -- that was on the form of an
14  overhead projector sheet.
15    Q.  Transparency?
16    A.  Yes.
17    Q.  And what happened to that transparency?
18    A.  It would be used again and again in round
19  tables.
20    Q.  How was it that you used Dr. Simon's claim
21  particulars over and over again?
22    A.  Sorry.  It would be wiped off and reused.
23    Q.  Oh, it was a fill in the blanks?
24    A.  Yes, yes.
25    Q.  So is that the only information that was

56

1  provided to the participants at the round table
2  meeting?
3    A.  That would be correct, yes.
4    Q.  All right.  What do you recall about the
5  specifics of the discussion of Dr. Simon's claim at
6  that meeting?
7    A.  There was a consultant referral form dated
8  April 23, 1998, which makes reference to the round
9  table and the activities that were recommended out of
10  the round table.
11    Q.  Can I see that?  This was prepared afterward;
12  right?
13    A.  Correct.
14    Q.  Was there any -- is there any document that
15  summarizes what was discussed at the round table?
16    A.  Nothing beyond the recommended actions as a
17  result of the round table.
18    Q.  Okay.  Was there any document that listed the
19  participants at the round table?
20    A.  No.
21    Q.  Was there any document that -- in the nature
22  of minutes of what was discussed?
23    A.  No.
24    Q.  This says follow up with Cheryl Jariz,
25  J-A-R-I-Z, whose insured was under Dr. Simon's care.

57

**Page 101**

1    Q.   At the round table, was a decision made to
2   work to terminate Dr. Simon's claim?
3    A.   Who.
4    Q.   Was a decision made, in fact, to terminate
5   the claim?
6    A.   No.
7    Q.   At either of the round tables?
8    A.   Not that I recall, no.
9    Q.   Okay. If such a decision had been made,
10   would it have been recorded in writing anywhere?
11    A.   It would have been noted on the consultant
12   referral form, yes.
13    Q.   What's the consultant referral form? That's
14   the little handwritten thing?
15    A.   Yeah.
16    Q.   And was that done in all cases?
17    A.   Yes.
18    Q.   Was there a policy at Provident to zero in on
19   psychiatric claims?
20    A.   No.
21    Q.   Was there a policy to subject those claims to
22   more intense scrutiny because they were expensive
23   claims?
24    A.   No.
25    Q.   Was there a policy to zero in on psychiatric

**Page 102**

1   claims because they had had a worse-than-anticipated
2   loss performance?
3    A.   No.
4    Q.   Psychiatric claims were never singled out for
5   any particular scrutiny?
6    A.   I would say no particular scrutiny, no.
7    Q.   Were they targeted because there was a larger
8   gray area in psychiatric claims?
9    A.   I would agree with the fact -- I don't agree
10   that they were targeted or held up to any closer
11   scrutiny. I would agree with the fact that
12   psychiatric claims tend to be more subjective in
13   nature, and for that reason, it's important to do a
14   fair and appropriate review of those claims.
15    Q.   Did Provident create and staff its psych unit
16   because those claims -- because psychiatric claims are
17   more susceptible of resolution because there are more
18   gray area claims?
19    A.   That would not be my understanding, no.
20    Q.   Did the creation of the psych unit positively
21   impact Paul Revere's reserves?
22      MS. O'BRIEN: Objection to form. Your
23   previous question was about Provident.
24   BY MR. KATZ:
25    Q.   All right. Did it positively impact any of

**Page 103**

1   the reserves of any of the Unum Provident Companies?
2    A.   Not that I'm aware of.
3    Q.   Who is Ralph Mohney, M-O-H-N-E-Y?
4    A.   He is a vice president within the
5   organization.
6    Q.   And did Mr. Mohney focus on claim department
7   resources in an effort to improve the Provident
8   Company's abilities to terminate claims?
9    A.   No.
10    Q.   He didn't do that?
11    A.   No, I would say that's not accurate.
12    Q.   Did Mr. Kinback do that?
13    A.   No.
14      MR. KATZ: Would you mark this, please?
15      (Exhibit No. 14 was marked for identification.)
16   BY MR. KATZ:
17    Q.   Let me show you a memo of April 25, 1995, to
18   Ralph Mohney from Christopher Kinback, and ask whether
19   you've ever seen that before?
20    A.   No, I have not.
21    Q.   Would you turn to the fourth page from the
22   back? It's Page 1899.
23    A.   Okay.
24    Q.   And you see where it says psych?
25    A.   Yes.

**Page 104**

1    Q.   Okay. Isn't it true that psych claims were
2   specifically targeted because they had gray areas, and
3   were therefore more susceptible to being terminated
4   than other kinds of claims?
5      MS. O'BRIEN: Objection to form.
6      THE WITNESS: Again, no, that's not my
7      understanding.
8   BY MR. KATZ:
9    Q.   Isn't it true that they were targeted because
10   there's a greater chance of resolution?
11      MS. O'BRIEN: Objection to form.
12      THE WITNESS: Again, that's not my
13      understanding.
14   BY MR. KATZ:
15    Q.   Isn't it true that the increased targeting of
16   psych claims resulted in positive impacts to the
17   reserves of Unum Provident's constituent companies?
18      MS. O'BRIEN: Objection to form.
19      THE WITNESS: Again, that's not my
20      understanding.
21   BY MR. KATZ:
22    Q.   As you sit here today, were you ever aware
23   that Provident had any corporate -- made any corporate
24   decision to increase the resources devoted to
25   psychiatric claims in an effort to improve its loss

outcomes in those claims?

2     MS. O'BRIEN: Objection to form.

3     THE WITNESS: No.

4   BY MR. KATZ:

5     Q. Never have?

6     A. No.

7     Q. Okay. Did Provident single out physicians'

8   claims -- withdrawn. Did Provident single out own

9   occupation disability claims filed by physicians for

10   special scrutiny?

11     A. No.

12     Q. Did Provident regard physician occupations as

13   known problem areas?

14     A. No.

15     Q. Did Provident have worse-than-expected

16   results in own occupation claims on policies issued to

17   physicians?

18     A. Not to my knowledge.

19     Q. Have you ever spoken with Ralph Mohney about

20   that?

21     A. No.

22     Q. Does the term scrub mean anything to you?

23     A. I've heard of the word, yes.

24     Q. And what's it mean?

25     A. Again, that's not a term that's been used or

105

1   a process that's been used during my time of

2   employment. My understanding is that it referred to a

3   particular review or audit of files.

4     Q. And what did that particular review or audit

5   do?

6     A. Again, I don't know. I'm not aware.

7     Q. Was the term used at any time while you were

8   with Provident?

9     A. No, not that I recall.

10     Q. Okay. Did you ever participate in anything

11   called a scrub?

12     A. I did not.

13     Q. Was it your understanding that Mr. Mohney had

14   suggested that the scrub should be accelerated?

15     A. I'm not aware of that.

16     Q. Was scrub formerly a quarterly review where

17   each file would get reviewed once every three months

18   to determine whether it could be closed?

19     A. Again, I'm not aware of that.

20     Q. How frequently did you have round table

21   meetings?

22     A. Round table meetings were held once a week.

23   That did not mean that I always attended each round

24   table.

25     Q. How were claims selected to be presented at

106

1    Q.  You don't believe that Dr. Feist told the
2    truth when he said under oath that the purpose of the
3    round tables was to find ways to terminate claims?
4    A.  That has not been my experience of round
5    table, no.
6    Q.  Was it the normal practice at round tables to
7    try to determine whether the claim should be closed?
8    A.  Again, I would say no.
9    Q.  Okay.  And if Dr. Feist so testified, he'd be
10   in error as far as you were concerned?
11   A.  In my experience at round tables, yes.
12   Q.  Do you know a physician named Shaughnessy?
13   A.  I'm sorry?
14   Q.  Do you know a physician named McSharry,
15   Fergal McSharry?
16   A.  I know of him, yes.
17   Q.  Did you ever have any round tables with Dr.
18   McSharry?
19   A.  I did not.
20   Q.  Did you ever have any contact with Dr.
21   McSharry?
22   A.  I did not.
23   Q.  Dr. McSharry testified that claims
24   representatives were given target numbers for claims
25   closed on a monthly basis.  Is he right?

                                                    117

1    A.  No.
2    Q.  Did you ever get a target number to close X
3    dollar amount of claims?
4    A.  I have not.
5    Q.  Were you ever told that you needed to reduce
6    your reserves on a monthly basis by X thousands or X
7    millions of dollars?
8    A.  I was not.
9    Q.  Did you ever hear of a Provident business
10   practice where claims representatives generally were
11   told that they had financial targets that they had to
12   meet on a monthly basis?
13   A.  No.
14   Q.  Never happened as far as you're concerned?
15   A.  No, not in my experience.
16   Q.  Okay.  Did you watch the 60 Minutes
17   presentation --
18   A.  (Interposing) I did.
19   Q.  -- on Unum Provident?
20   A.  I did.
21   Q.  And did you see the people that were
22   interviewed on 60 Minutes?
23   A.  I did.
24   Q.  And did you hear them describe practices
25   about setting financial targets?

                                                    118

2      A.   It was a regular round table.
3      Q.   Okay.  And do you know the number of people
4   that were present?
5      A.   I do not recall, no.
6      Q.   Are you familiar with a case called
7   Handgartner versus Paul Revere Life Insurance Company?
8      A.   I've heard the case.  I don't know the
9   particulars of it.
10      Q.   And in what context have you heard the case?
11      A.   Nothing more than that it was a recently
12   litigated case, I believe out of the State of
13   California, and I believe she was a chiropractor.
14      Q.   Magistrate Judge Larson of the Northern
15   District of California wrote an opinion in the
16   Handgartner case, and one of the things that he wrote
17   is as follows:  Defendants in the case at bar
18   developed with the expertise of Ralph Mohney a
19   comprehensive system for targeting and terminating
20   expensive claims like Plaintiff's.  She was a
21   professional in California with an own occupation
22   policy.  Under Defendant's risk analysis, her claim
23   fit the profile as one with a potentially adverse
24   impact on Defendants.
25           Do you know whether Magistrate Judge

132

1   Larson is right when he writes that Defendants
2   developed a comprehensive system for targeting and
3   terminating expensive claims like Plaintiff's?
4           MS. O'BRIEN:  Objection to form.
5           THE WITNESS:  I can answer that
6           question from my eight years of experience
7           with the company, I have never been asked
8           to specifically target any claims based on
9           occupation or monthly benefits.
10   BY MR. KATZ:
11      Q.   So if a comprehensive system for targeting
12   and terminating expensive claims was developed, it
13   doesn't apply to you?
14           MS. O'BRIEN:  Objection to form.
15           THE WITNESS:  I would say that, again,
16           that has not been my experience.
17   BY MR. KATZ:
18      Q.   Okay.  Do you know whether such a system was
19   developed and simply not applicable to claims that you
20   handled?
21      A.   I am familiar with our claims philosophy in
22   how we are to review and evaluate claims.  I'm not
23   aware of any comprehensive plan that would target
24   specific claims.
25      Q.   Magistrate Judge Larson also wrote as

133

1      A.   Correct.

2      Q.   Okay.  Were appeals handled by appeal

3   consultants?

4      A.   At that particular -- I mean I can speak for

5   the set-up of the Chattanooga office.  I'm not certain

6   of the structure of the Worcester office at that time.

7      Q.   In Chattanooga are there appeal consultants?

8      A.   There's a separate appeals area, yes.

9      Q.   Okay.  And is that something that you've

10   done, you yourself?

11      A.   Appeals work?

12      Q.   Yes.

13      A.   I've been involved with the appeals

14   department, but not a -- am not an employee of the

15   appeals area.

16      Q.   Okay.  So whatever involvement you've had

17   with them would be like on a consultant or

18   troubleshooting basis or something like that?

19      A.   If it involved a claim file in which I've

20   been involved in, yes.

21      Q.   Oh, okay.  So the appeals people in

22   Chattanooga would talk to you if one of your claims

23   got appealed?

24      A.   Correct.

25      Q.   But in terms of adjudicating appeals, that's

                                                          169

1

2

3

4

5

6 IN THE UNITED STATES DISTRICT COURT

7 FOR THE DISTRICT OF ARIZONA

8

9 ROBERT D. LIGORSKY ,                    No. CIV 00-1318-PHX-MHM

10          Plaintiff,                     **ORDER**

11 vs.

12
   THE PAUL REVERE LIFE INSURANCE
13 CO., et al ,

14          Defendant.

15

16

17          Currently pending before this Court are Defendants' Motion for Partial Summary

18 Judgment Re Bad Faith and Punitive Damages (Dkt. # 76), Defendant Provident Life's

19 Summary Judgment Motion Re Alter Ego Liability (Dkt. # 77), Defendants' Motion to

20 Exclude Dr. Feist's Testimony (Dkt. # 153), and Defendants' Motion to Exclude McSharry's

21 Testimony (Dkt. # 165), and the responses and replies thereto.  Having reviewed all of the

22 pleadings and supporting evidence, and having heard oral argument on these motions on

23 January 10, 2002, the Court issues this Order.

24 **I.      Factual and Procedural Background**

25          Plaintiff Dr. Robert Ligorsky, D.O., is a physician who for 23 years specialized in

26 hematology and oncology, the diagnosis and treatment of patients with cancer and blood

27 disorders. He was a 51% shareholder of his medical practice, Valley Medical Specialist, Ltd.

28

1        Dr. Ligorsky had purchased three disability policies from The Paul Revere Life

2    Insurance Co. between 1984 and 1991. Valley Medical Specialist, Ltd., also purchased a

3    disability buy-sell policy in 1992, with Dr. Ligorsky as the insured.

4        **A.    Onset of Symptoms**

5        Between 1997 and 1999, Dr. Ligorsky became more and more depressed and

6    physically ill as a result of the demands of his medical practice. Among the symptoms he

7    reported were panic attacks, inability to function, explosive gastrointestinal symptoms, lack

8    of concentration, inability to sleep, and loss of ability to make decisions about patients'

9    condition and care. On April 30, 1999, Dr. Ligorsky sought treatment from Dr. Harold D.

10   Udelman, a psychiatrist. Dr. Udelman diagnosed Dr. Ligorsky with depression and began

11   psychotherapy. He later prescribed an antidepressant and anti-anxiety medication. On May

12   7, 1999, with the agreement of Dr. Udelman, Dr. Ligorsky reached a decision that he could

13   no longer practice as an oncologist/hematologist because of his severe depression, and that

14   he would apply for disability benefits.

15       **B.    Application for Disability**

16       On May 28, 1999, Dr. Ligorsky quit practicing hematology/oncology, and submitted

17   a claim for disability benefits. His initial statement in support of his claim described the

18   restrictions imposed by his depression as follows:

19           I am a physician specializing in the diagnosis and treatment of patients with cancer
             and disorders of the blood. My work week varies averaging 50-60 hours plus taking

20           calls. I am constantly frustrated in my attempt to practice medicine and to provide
             medical care to my patients. It has caused me to become depressed and physically ill

21           on a daily basis. As a result I cannot continue in this occupation.

22   App. 9 to Defendant's Statement of Facts.

23       The policies define "total disability" in pertinent part as an inability to perform the

24   important duties of the insured's regular occupation (in the case of one of the disability

25   income policies and the buy/sell policy) or occupation (in the case of the two other disability

26   income policies) "because of injury or sickness."

27

28

1

2      **C.     The Insurance Investigation**

3      After an initial waiting period, Paul Revere began paying Dr. Ligorsky's claims on

4      the three disability policies.  Paul Revere also began an investigation of the claims.  The

5      investigation included interviewing Dr. Ligorsky over the phone and in the field, speaking

6      with his medical partner, Dr. Cohen, and his psychiatrist, Dr. Udelman, conducting

7      surveillance in front of his house during his daughter's wedding, obtaining an independent

8      medical examination from psychologist Dr. Deborah Willson and psychiatrist Dr. Stephen

9      Pitt, and having the claim reviewed by in-house consultant Dr. Stuart Anfang, a psychiatrist.

10     **1) Letter Re Field Representative**

11     On June 21, 1999, claim representative Michelle Chase sent plaintiff a letter advising

12     him that a field representative would be visiting plaintiff on a personal basis.  She stated:

13          The purpose of this visit is strictly goodwill.  Our Representative will gather some
            specific information concerning your disability and will be able to answer any
14          questions you might have concerning your disability policies with this company.

15     Ex. 4, p. 37, to Plaintiff's Statement of Facts.  The field representative asked Dr. Ligorsky

16     in part about any academic positions he held, an issue as to whether different disability

17     standards would apply.

18     **2) Dr. Udelman's Opinion**

19     On July 14, 1999, Dr. Udelman completed a psychiatric assessment form with the

20     diagnosis of Depressive Disorder Not Otherwise Specified.  He specified "work stress" as

21     the occupational problem, and reported plaintiff was suffering from depression, poor energy

22     level, insomnia, depressed mood and constricted affect, and identified treatment goals of

23     medication management and psychotherapy to decrease depression.  He stated plaintiff was

24     unable to resume his regular occupation because "stresses of medical practice inhibit ability

25     to function.

26     On October 4, 1999, Dr. Udelman confirmed in a letter to Paul Revere that it was his

27     opinion that Dr. Ligorsky was continuously disabled from his profession due to "the severity

28

-3-

1  of his depression . . . tied to the difficulty he faces in life and death issues that occur daily in

2  his speciality."

3          **3) Round Table Review**

4      On September 29, 1999, the insurer conducted a "round table review" of plaintiff's

5  claim at which it was decided to conduct surveillance of plaintiff October 7 to 10, get an

6  early independent medical examination, and continue to pay benefits under a reservation of

7  rights until additional clinical information from the examination and surveillance was

8  obtained.

9          **4) Surveillance**

10      Surveillance was conducted of plaintiff between October 7-10, 1999, did not reveal

11  anything significant, and was consistent with Dr. Ligorsky's claim that he was suffering from

12  depression.

13      Dr. Cohen was interviewed and reported that he had observed Dr. Ligorsky becoming

14  more frustrated with managed care medicine, and that while Dr. Ligorsky's report that he

15  could no longer work because of depression was unexpected, Dr. Cohen and the staff at

16  Valley Medical Specialist had previously noticed that Dr. Ligorsky was exhibiting symptoms

17  of depression on a daily basis.

18      **D.**    **The Independent Medical Examiners' Opinions**

19      On December 1, 1999, Dr. Anfang, psychiatrist consultant to UNUM/Provident,

20  parent company of Paul Revere, and Larry Iannetti, MA/CAGS, psychiatric disability case

21  manager, sent cover letters to Drs. Willson and Pitt requesting the independent medical

22  examination raising several issues regarding Dr. Ligorsky's claims.  The cover letters

23  detailed Dr. Ligorsky's report of an active social, exercise and travel schedule, his

24  dissatisfaction with the practice of medicine in the managed care environment, the brief

25  period he was seen by a psychiatrist before the psychiatrist determined it was unknown

26  whether he would ever return to work, and the absence of any information to suggest that

27  treatment had ever been designed to assist Dr. Ligorsky in returning to work.  Dr. Pitts was

28

-4-

1  specifically asked, among other things, to report on "non-clinical factors (motivation to

2  return to work, secondary gain, etc.) that may impact insured's disability claim."

3          **1) Dr. Willson's Opinion**

4          On December 20, 1999, Dr. Wilson performed an MMPI-2 testing and conducted a

5  structured interview of Dr. Ligorsky.  She summarized as follows:

> Dr. Robert Ligorsky appears to be experiencing a slowly resolving Major Depression
> with anxiety features also prominent. He experiences moderate panic episodes and
> increased obsessive-compulsiveness, although feels these are also less severe than a
> few months ago.  He has self-diagnosed with Irritable Bowel Syndrome, but has
> sought no medical consultation for this ongoing problem.  His anxiety and somatic
> symptoms are almost certainly psychosomatic, given his own report of complete
> remission when he was on vacation out of the country. However, he is someone who
> has significant capacity to repress and mask his true emotional distress for periods of
> time ("smiling depression"), and such temporary dramatic improvements do not
> necessarily mean his overall psychological state is robust or stable.

Ex. 17 to Plaintiff's Statement of Facts. Dr. Willson recommended a consultation for his GI

distress, more direct and aggressive treatment of his panic and anxiety symptoms, as well as

treatment of his moderately severe sleep disruption, and a second opinion concerning

treatment of his overall psychological condition.

          **2) Dr. Pitt's Opinion**

          Dr. Pitt performed an independent psychiatric evaluation on Dr. Ligorsky on February

16, 2000, and issued a 40-page report detailing his opinion  on April 14, 2000.  Ex. 2 to

Plaintiff's Statement of Facts.  Dr. Pitt summarized his opinion that Dr. Ligorsky had

suffered from a Major Depressive Episode in the past, "his condition has improved

dramatically and his symptoms are now in partial remission."  Dr. Pitt gave Dr. Ligorsky a

"current global assessment of functioning" score, on Axis V of the DSM-IV Diagnosis of 70-

80.  See id. at p. 37.

          With respect to whether Dr. Ligorsky's symptoms limited his occupational function,

Dr. Pitt stated:

> Dr. Ligorsky's current symptoms do not, at this time, limit his ability to function
> occupationally. That is, from a purely phenomenologic basis, there is nothing about
> Dr. Ligorsky's current presentation that limits him from practicing his chosen
> occupation. However, I believe that a big obstacle in getting Dr. Ligorsky to return

-5-

1    to work, is going to be getting the claimant to appreciate and understand the fact that
2    there is nothing psychologically limiting him from returning to work.

3    <u>Id.</u> at p. 37. With respect to treatment recommendations, Dr. Pitt stated:

4    . . . Notwithstanding the excellent work that Dr. Udelman has done in "treating" Dr.
     Ligorsky's symptoms, I believe that little effort or attempt has been made to return Dr.
5    Ligorsky to work. Rather, it would appear that after a relatively brief period of time,
     Dr. Udelman concluded that there was no way Dr. Ligorsky was ever going to be able
6    to return to work. Whether Dr. Udelman has currently assessed this issue remains
     unclear.  Indeed, I believe that it is premature to come to any conclusions about
7    whether Dr. Ligorsky can or cannot return to work in the absence of at least trying to
     get him to return to work. Thus, it is my opinion, to a reasonable degree of medical
8    certainty, that Dr. Ligorsky would benefit from individual therapy that was geared
     toward facilitating his return to his chosen profession. . .
9

10   <u>Id.</u> at p. 39.

11       E.    Dr. Anfang's Review

12       On May 1, 2000, UNUM/Provident inhouse consultant Dr. Stuart Anfang, M.D.,

13   drafted a memorandum summarizing his opinions on Dr. Ligorsky's claim based on a review

14   of Dr. Pitt's IME report as well as the transcript and videotape of the clinical interview.  Dr.

15   Anfang opined that he found Dr. Pitt's IME report to be "very thorough, comprehensive, well

16   reasoned and balanced in analysis." He summarized Dr. Pitt's conclusions as follows:

17   His [Dr. Pitt's]clear conclusion is that insured suffers from no current significant
     psychiatric impairment barring RTW [return to work] as a physician. While there was
18   a depressive episode, this appears to be almost totally remitted (GAF 70-80) with
     appropriate treatment.  The major obstacle to RTW [return to work] appears to be
19   insured's belief (supported by his AP [attending physician]) that he is permanent
     disabled due to his (now-improved) depression and "burnout." . . . He suggests that
20   therapy should be aggressively geared towards RTW, providing insured with the
     appreciation and understanding that "there is nothing psychologically limiting him
21   from returning to work." This would require a re-orientation in his current therapy,
     which may be possible with Dr. Udelman. Insured has expressed frustration with the
22   current managed care practice of medicine, a concern which Dr. Pitt noted in their
     interview would be common to thousands of similar physicians in their community.
23   While insured may make a reasonable choice (supported by AP [attending physician])
     not to return to the increasingly stressful practice of managed medicine, this is not a
24   restriction of significant functional impairment due to active psychiatric symptoms.

25   Exp. 19 to Defendant's Statement of Facts, p. 2.

26       F.    Termination of Dr. Ligorsky's Disability Benefits

27       On May 2, 2000, in a 9-page letter, UnumProvident Insurance Company notified

28   plaintiff that it was terminating his benefits because it determined that he did not qualify for

- 6 -

1 total disability, which is defined under the policies as an inability to perform the important

2 duties of the insured's occupation because of injury or sickness.

3        The letter outlined the company's reasoning in detail, citing the lack of

4 documentation of or treatment for panic attacks or sleep disorder, Dr. Willson's opinion that

5 his anxiety and somatic symptoms were almost certainly psychosomatic, Dr. Pitt's opinion

6 that "there is nothing about Dr. Ligorsky's current presentation that limits him from

7 practicing his chosen occupation," and Dr. Anfang's conclusion that he was not suffering

8 from "a restriction of significant functional impairment due to active psychiatric symptoms."

9 The letter concluded in pertinent part:

10       At this time it appears that you may be able to return to work with additional
      treatment. Therefore, we conclude that you no longer meet the definitions of total

11       disability as outlined by all four of your contracts.

12 Ex. 14 to Defendant's Statement of Facts. The insurer provided Plaintiff with an

13 additional three months of benefits to aid in the transition.

14     **G.**    **The Defendants In This Case**

15        Plaintiff has named as defendant in this case The Paul Revere Life Insurance

16 Company, the company from whom plaintiff purchased the disability policies. Plaintiff has

17 also named UNUM/Provident Corporation, whose employees processed plaintiff's claim for

18 disability benefits. Plaintiff also named as defendant Provident Companies, Inc., a

19 predecessor corporation to UNUM/Provident Corporation. Plaintiff has also named as a

20 defendant Provident Life and Accident Insurance Company, a subsidiary of

21 UNUM/Provident Corporation, as is The Paul Revere Life Insurance Company. Plaintiff

22 alleges that Provident Life and Accident Insurance Company is an alter ego of, or involved

23 in a joint venture with, The Paul Revere Life Insurance Company, and is liable on that basis.

24     **D.**    **The Claims At Issue**

25       In this lawsuit, Dr. Ligorsky alleges breach of contract and bad faith and seeks

26 punitive damages against defendants for the termination of his disability benefits on May 2,

27 2000.

28

1       In the pending motions, Defendants seek partial summary judgment on the bad faith

2   claim and claim for punitive damages and Provident Life and Accident Insurance Company,

3   a foreign corporation, seeks summary judgment on the claim against it, which Plaintiffs have

4   based alternatively on alter ego or joint venture liability.

5       Defendants also seek by a separate motion to exclude the testimony of Dr. William

6   Feist, a former employee of Provident Life and Accident Insurance Company, and Dr.

7   Patrick Fergal McSharry, a former employee of UNUM/Provident. Neither of these doctors

8   had any involvement with Dr. Ligorsky's claim or the UNUM/Provident claims personnel

9   who reviewed it. Plaintiff has offered their testimony instead to show a "corporate culture"

10  of bad faith termination of insured's disability claims.

11  **II.    Standard of Review**

12      A motion for summary judgment may be granted only if the evidence shows "that

13  there is no genuine issue as to any material fact and that the moving party is entitled to

14  judgment as a matter of law." Fed. R. Civ. P. 56(c). To defeat the motion, the non-moving

15  party must show that there are genuine factual issues "that properly can be resolved only by

16  a finder of fact because they may reasonably be resolved in favor of either party." Anderson

17  v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986). The party opposing

18  summary judgment "may not rest upon the mere allegations or denials of [the party's]

19  pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial."

20  Fed. R. Civ. P. 56(e); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475

21  U.S. 574, 586-87, 106 S.Ct. 1348, 1356 (1986).

22      The Court views the evidence in the light most favorable to the nonmoving party,

23  Plaintiff here, and draws any reasonable inferences in the nonmoving party's favor. See

24  Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 516 U.S. 1171

25  (1996).

26

27

28

1

2  **III.    Discussion**

3         **A.    Motion on Alter Ego and/or Joint Liability**

4         Defendant Provident Life and Accident Insurance Company moved for summary

5  judgment on the issue of its liability for the termination of Dr. Ligorsky's disability benefits.

6  Plaintiff alleges that Provident Life and Accident Insurance Company is an alter ego of, or

7  involved in a joint venture with, The Paul Revere Life Insurance Company, and is liable on

8  that basis.

9         To establish alter ego or instrumentality liability, Plaintiff has the burden of proving

10  by a preponderance of evidence 1) such a unity of interest and ownership exists that the

11  separate personalities of the corporations cease to exist; and 2) observance of the corporate

12  form would promote injustice. Gatecliff v. Great Republican Life Ins. Co., 170 Ariz. 34, 37,

13  38-39, 821 P.2d 725, 728, 729-30 (1991).  To establish a joint venture, plaintiff must show

14  an agreement, a common purpose, a community of interest, and an equal right of control.

15  Sparks v. Republic National Life Ins. Co., 132 Ariz. 529, 540, 647 P.2d 1127, 1141 (1992).

16         Plaintiff purchased his disability policies from The Paul Revere Life Insurance Co.

17  The policies were marketed, underwritten and sold by The Paul Revere Life Insurance Co.

18  Dr. Ligorsky's claim was evaluated and processed, however, by employees of

19  UNUMProvident.

20         **1.    Joint Liability, Agency Liability, Joint Venture Liability**

21         Plaintiff argues that Provident Life and Paul Revere acted "jointly, in concert and in

22  bad faith for their mutual economic benefit and as a common benefit," as a "joint venture,"

23  and "as agents of one another" in connection with the investigation and denial of Dr.

24  Ligorsky's claim for disability benefits on his Paul Revere policies.

25         Plaintiff, however, has offered no evidence or argument in support of any of these

26  theories of liability.  Specifically, Plaintiff has offered no evidence that  any employee of

27  Provident Life and Accident Insurance Company had any role in evaluating and processing

28

-9-

1   his claim. Plaintiff has offered no evidence that either company was the agent of the other.

2   Finally, Plaintiff has offered no evidence that Provident Life was part of a joint venture with

3   Paul Revere. See Sparks v. Republic National Life Ins. Co., 132 Ariz. at 540, 647 P.2d at

4   1141 (plaintiff must show an agreement, a common purpose, a community of interest, and

5   an equal right of control).

6        A party opposing summary judgment "may not rest upon the mere allegations or

7   denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is

8   a genuine issue for trial." Fed. R. Civ. P. 56(e); see also Matsushita Elec. Indus. Co., Ltd.

9   v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1356 (1986). In filing their

10  motion for summary judgment on "alter ego" liability, Defendants sought dismissal of

11  Provident Life.    In opposing Defendants' motion for summary judgment on "alter ego"

12  liability, Plaintiff cited to his Complaint alleging these alternative theories of liability as a

13  measure to prevent dismissal of Provident Life, but failed to offer any evidence to support

14  these theories. Under these circumstances, the Court will grant summary judgment for

15  defendants on Plaintiff's theories that Provident Life acted jointly, in concert, as agents of

16  the other, or as a joint venture with Paul Revere, UNUMProvident, or Provident Companies.

17  See Matsushita Elec. Indus. Co., 475 U.S. at 586-87, 106 S.Ct. at 1356.

18       2.    Alter Ego Liability

19       Plaintiff argues that Paul Revere is an alter ego of Provident Life because the two

20  companies have "such a unity of interest and ownership. . that the separate personalities of

21  the corporations cease to exist," and that an injustice would result if Provident Life were not

22  held liable for the investigation and termination of Dr. Ligorsky's disability benefits.

23       Plaintiff argues that the following evidence shows that Paul Revere is an alter ego of

24  Provident Life: 1) the stock of both Paul Revere and Provident Life is owned by

25  UNUMProvident; 2) Paul Revere and Provident Life share some of the members of their

26  boards of directors; 3) Paul Revere and Provident Life share substantially the same officers;

27  4) neither Paul Revere nor Provident Life have any employees; 5) telephone messages with

28

- 10 -