1    regards to Dr. Ligorsky's claim were taken on Provident Life message pads, and Dr.

2    Ligorsky's Monthly Progress Reports were returned to Provident Life; 6) Employees who

3    worked on Dr. Ligorsky's claim variously identified themselves as employees of Provident

4    Life, Paul Revere, or UNUMProvident, although they testified they were all employees of

5    UNUMProvident; 7) Provident Life shares offices in Worcester with Paul Revere; 8) Internal

6    reporting of claim department operations is not broken down by whether the claims are made

7    under Paul Revere policies or Provident Life policies.

8         Plaintiff also argues that the financial statements show that Provident Life treated

9    Revere's financial interests as its own.  Specifically, Plaintiff argues that "Provident

10   employee Thomas Heys reported in 1997 that Provident employee Ralph Mohney's

11   renegotiation of Revere's contract with Equitable would add $4,000,000 to Provident's

12   bottom line." Plaintiff also argues that Paul Revere's and Provident Life financial statements

13   reflect significant transfers of funds between the two entities. Plaintiff interprets this

14   "summary of insurer's transactions with any affiliates" to reflect significant fund transfers

15   between Paul Revere and Provident Life for "Shareholder Dividends," specifically identified

16   on Schedule Y as (55,000,000); Purchases, Sales or Exchanges of Loans, Securities, Real

17   Estate, Mortgage Loans, or Other Investments," specifically identified on Schedule Y as

18   (195,881,890); and for "Management Agreement and Service Contracts," specifically

19   identified on Schedule Y as (144,090,155).

20        Defendants argue that Provident Life and Paul Revere are simply affiliates of one

21   another, with both leasing the employees of UNUMProvident to process their disability

22   claims. They offer evidence establishing the following history: Provident Life and Accident

23   Insurance Company is a subsidiary of UNUMProvident, which was created in 1999 by the

24   merger of the Provident Companys and UNUM Corp. The Paul Revere Corp., which wholly

25   owns The Paul Revere Life Insurance Company, is also a subsidiary of UNUMProvident.

26   Instead of having two separate claims departments, one for Paul Revere Life and one for

27   Provident Life, UNUMProvident leases its employees to the subsidiary corporations to work

28

- 11 -

1   on both insurance companies' policies.  The employees handle the Provident Life and Paul

2   Revere Life claims through the same claims process, but attempt to identify themselves on

3   individual claims by the name of the specific company (Provident Life or Paul Revere Life)

4   whose claims they are processing.

5       Defendants also argue that Plaintiff is misreading internal documents and speculating

6   as to the meaning of financial statements.   Specifically, Defendants offer evidence that

7   establishes to the Court that Plaintiff misreads a reference to the $4 million impact of a Paul

8   Revere contract on "Provident" in the 1997 internal memo as "Provident Life" when it is

9   actually a reference to the impact of the Revere contract on Provident Companies, the

10  holding corporation for Provident Life and Paul Revere. Defendants argue that Plaintiff's

11  interpretation of the "summary of insurer's transactions with any affiliate" on Paul Revere's

12  annual statement as sheer "speculation" not supported on the face of the statements, and that,

13  in any case, the statements "do not suggest anything other than legitimate business

14  transactions between many (14) related companies, which is not unusual," which does not

15  support alter ego liability or joint venture liability.

16      Thus, in this case, the evidence is  undisputed:

17      1) Provident Life and Paul Revere are both subsidiaries of UNUMProvident, and that

18  each company issues separate financial statements and markets separate policies.

19      2) Provident Life and Paul Revere share many if not most of the same officers and

20  directors;

21      3) UNUMProvident has consolidated the operations of both companies under one

22  umbrella, with each company separately leasing UNUMProvident employees to process its

23  claims.

24      4) UNUMProvident does not segregate claims by Paul Revere or Provident Life when

25  it issues internal reports on claims processing;

26      5) UNUMProvident employees under lease to Paul Revere processed Dr. Ligorsky's

27  disability claim;

28

- 12 -

6) No one from Provident Life handled Dr. Ligorsky's claim, although some of the UNUMProvident employees mistakenly identified themselves as Provident Life employees or mistakenly used Provident Life forms to process the claim.

Plaintiff has also offered as evidence Paul Revere's annual statements showing on Schedule Y some negative numbers next to Provident Life's name in categories of shareholder dividends, management agreements and service contracts and purchases, sales, exchanges or other investments. Plaintiff suggests in his argument, but without support from expert testimony or even lay testimony, that these statements "reflect significant financial transfers between the entities," which shows "that Provident Life treated Paul Revere's financial interests as its own." Without more, this Court cannot accept Plaintiff's argument as a reasonable inference from this evidence.

Having reviewed the financial statements and all other evidence presented by Plaintiff in support of his argument that Provident Life and Paul Revere were alter egos of one another, and viewing this evidence in the light most favorable to Plaintiff, the Court nevertheless finds that Plaintiff has failed to offer sufficient evidence to take to the jury his claim that Provident Life had a unity of control or interest with Paul Revere such that their separate corporate personalities ceased to exist, and it would create an injustice to honor the separate corporate entities. See Simon v. UNUMProvident Corp. et al. 2002 WL 1060832 at *5 (E. D. Pa. May 23, 2002) (granting summary judgment dismissing Provident Life from lawsuit involving a Paul Revere disability policy where no evidence had been presented to show that Provident Life exercised any dominion and control over Paul Revere's claims, finances or policies). At most, plaintiff has established that Paul Revere and Provident Life are affiliates of one another, as both are subsidiaries of UNUMProvident, and that they share the same officers, directors, and parent corporation, and their operational functions are combined.   Under Arizona law, the mere fact that corporation have the same officers and directors does not make one liable for the acts of the other. See Jabczenski v. Southern Pacific Memorial Hospitals. 119 Ariz. 15, 21, 579 P.2d 53, 59 (Ct. App. 1978).   Here, as in

1    Simon, plaintiff "does not allege that Provident Life exercised any dominion and control over

2    Paul Revere's claims finances or policies, or that Provident Life issued, investigated, or

3    terminated Plaintiff's disability benefits." Simon v. UNUMProvident Corp. et al, 2002 WL

4    1060832 at *5. Under these circumstances, Provident Life is entitled to judgment as a

5    matter of law. See id.

6       **B.**    **Motions to Exclude Testimony**

7       Before addressing Defendants' motion for summary judgment on bad faith and

8    punitive damages, the Court will address Defendants' separate motions to exclude Dr. Feist's

9    testimony and Dr. McSharry's testimony.

10       **1.**    **Dr. Feist's Testimony**

11       Defendants have moved to exclude the testimony of Dr. William Feist, a former

12    employee of Provident Life and Accident Insurance Company, whose deposition was taken

13    in an unrelated case. They have moved to exclude the testimony on the grounds that Dr. Feist

14    has no connection to the company that issued the policy at issue here, no connection to the

15    company that employed the people who administered plaintiff's claims, and his testimony

16    lacks relevancy and foundation, is unreliable, and would be unfairly prejudicial.

17       Dr. Feist was a vice president and medical director of Provident Life & Accident

18    Insurance Co. from 1990 until his resignation in February 1996. Plaintiff has offered

19    testimony from Dr. Feist as to his personal observations of the corporate culture at Provident

20    Life & Accident Insurance Co. in 1994 and 1995, and his personal impressions of the

21    purpose of "round-table" reviews of claims.

22       Dr. Feist has been offered by plaintiffs as a lay witness in this action to testify as to

23    Provident Life & Accident Insurance Co.'s claims policies and practices when he worked

24    there until 1996. It is undisputed, however, that Dr. Ligorsky purchased the disability

25    policies from The Paul Revere Life Insurance Co. It is also undisputed that employees of

26    UNUMProvident Corp. processed Dr. Ligorsky's claim beginning in 1999. It is also

27    undisputed that Dr. Feist had left the employ of Provident Life three years before Dr.

28

- 14 -

1   Ligorsky filed his claim, and before Provident Life's parent company (Provident Corp. now

2   known as UNUMProvident) acquired Paul Revere Life.  Finally, it is undisputed that Dr.

3   Feist had no involvement in processing Dr. Ligorsky's claim for disability.   Nor has he

4   offered any personal observations of how the claims personnel responsible for handling Dr.

5   Ligorsky's claim performed this evaluation or any other claims evaluation.  Dr. Feist has

6   offered only his own personal impressions that Provident Life was more concerned about

7   terminating high dollar claims than concern for the disability claimants before he left in 1996.

8        This Court finds as a result that Dr. Feist has no personal knowledge that would allow

9   him to testify as to the handling of plaintiff's claim, and his proffered  testimony regarding

10  his personal observations of the corporate culture at Provident Life three years before Dr.

11  Ligorsky filed his disability claim lacks foundation as to the corporation culture or handling

12  of Dr. Ligorsky's claim by UNUMProvident more than three years later. It must be excluded

13  on this ground alone.  See Fed. Evid. Rule 602 (personal knowledge is a prerequisite to

14  testimony).  Moreover, the probative value of Dr. Feist's testimony as to the handling of Dr.

15  Ligorsky's claim, if any, is substantially outweighed by the danger of unfair prejudice to

16  defendants, confusion of the issues, and considerations of undue delay.  For example,

17  defendants would have the right to introduce impeachment testimony from depositions of Dr.

18  Feist taken in a number of unrelated cases, turning this trial into a number of unrelated mini-

19  trials on the issues in those cases.  Dr. Feist's testimony must be excluded on this ground as

20  well.  See Fed. Evid. Rule 403;  See Hyatt v. Unum Life Ins. Co. of America, 2001 WL

21  826551 at *3 n. 7 (D. Del. 2001) (holding that Dr. Feist's testimony was irrelevant to dispute

22  that arose with regards to a disability claim several years after Dr. Feist worked for Provident

23  Life before it had merged with Unum).

24       Having reviewed the deposition testimony of Dr. Feist, this Court finds that Dr. Feist

25  is offering only his own personal impressions of the corporate culture or state of mind at the

26  time he worked there, and no factual evidence supporting those impressions.  His testimony

27  should be excluded for this reason as well.  See Yumukoglu v. Provident Life & Accident

28

- 15 -

1  Ins. Co., 131 F. Supp. 2d 1215, 1228 (D. N.M. 2001) (holding that Dr. Feist's testimony was

2  inadmissible because "[c]onclusory allegations, without specific supporting facts, have no

3  probative value and are therefor insufficient to create a genuine issue of material fact"); cf.

4  Hawkins v. Allstate Ins. Co., 152 Ariz. 490, 498, 733 P.2d 1073, 1081 (1988) (admitting

5  testimony of former claims adjustor in the same office that he had been specifically instructed

6  by several Allstate managers to automatically deduct certain sums on property damage claims

7  "to explain Allstate's motive or its state of mind when dealing with the Hawkins and other

8  insureds").

9         2.       Dr. McSharry's Testimony

10        Defendants have also moved to exclude the testimony of Dr. Patrick McSharry, a

11  former employee of UnumProvident Corp., whose deposition was taken in an unrelated case.

12  Defendants have moved to exclude his testimony on the grounds that Dr. McSharry never

13  worked on plaintiff's claim or in the geographic area in which plaintiff's claim was handled,

14  and was not hired until months after plaintiff's claim was closed in May 2000,[1] and his

15  testimony constitutes inadmissible lay opinion, is irrelevant and unfairly prejudicial, and

16  constitutes improper evidence of other alleged wrongs to show conformity therewith.

17        Dr. McSharry worked at UnumProvident in its Chattanooga, Tenn. office, for 13

18  months from November 2000 to January 8, 2002, and has sued UnumProvident for wrongful

19  termination, claiming that he was terminated for whistleblower activity. Dr. McSharry had

20  no involvement in processing Dr. Ligorsky's claim for disability and knows nothing about

21  how it was handled, the basis for plaintiff's disability claim, or the reasons for its

22  termination. Nor has Dr. McSharry offered any testimony with regards to any of the doctors

23  and/or claims specialists who made the decision to close plaintiff's claim.

24        Plaintiff offers Dr. McSharry's personal observations to show that UnumProvident

25  looked for ways to deny claims, engaged in "doctor shopping," and pressured staff to deny

26  _____

27        [1] Dr. McSharry testified that he reviewed records 20 hours a week as an independent contractor for
   Provident between August 1999 and December 1999, but plaintiff offers his testimony only from his
28  employment between November 2000 and January 2002.

1    claims, during the 13 months he worked there between November 2000 and January 2002.

2    Specifically, Dr. McSharry's testimony relies on comments made by his supervisors and by

3    various personnel, reprimands given, and his observations of "monthly targets to close claims

4    and methods by which attempts were made to reach these targets."   Plaintiff argues that

5    "various internal company documents" corroborate Dr. McSharry's observations, but he does

6    not cite to any specific document corroborating any specific observation.

7        This Court finds, just as it found with regards to Dr. Feist's testimony, that the

8    probative value of Dr. McSharry's testimony as to the handling of Dr. Ligorsky's claim, if

9    any, is substantially outweighed by the danger of unfair prejudice to defendants, confusion

10   of the issues, and considerations of undue delay.  Again, defendants would have the right to

11   introduce impeachment testimony regarding Dr. McSharry's employment history, and any

12   incidents that might form the basis of Dr. McSharry's opinions, turning this trial into a

13   number of unrelated mini-trials on the issues with regards to those unrelated incidents.   Dr.

14   McSharry's testimony should be excluded for this reason alone.   See Fed. Evid. Rule 403

15   ("Although relevant, evidence may be excluded if its probative value is substantially

16   outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury,

17   or by considerations of undue delay, waste of time, or needless presentation of cumulative

18   evidence"); Estate of Le Baron v. Rohm & Haas Co., 506 F.2d 1261 (9th Cir. 1974)

19       Dr. McSharry has not offered any testimony similar to that held admissible in

20   Hawkins v. Allstate Ins. Co., 152 Ariz. 490, 733 P.2d 1073, 1081 (1988), where claims

21   representatives testified that supervisors instructed them to automatically or always

22   improperly deny disability claims.  See Hawkins, 152 Ariz. at 498, 733 P.2d at 1081. Having

23   reviewed the deposition testimony of Dr. McSharry, this Court finds that Dr. McSharry, like

24   Dr. Feist, is offering only his own personal impressions of the corporate culture or state of

25   mind at the time he worked there, and only anecdotal evidence supporting those impressions.

26   He has not offered any linkage between his personal impressions and how this claim was

27   handled.   His testimony should be excluded for this reason as well.  See   Cardiner v.

28

- 17 -

1 | Provident Life, 158 F. Supp. 2d 1088, 31 F. Supp. 2d 1215, 1228 (C.D. Calif. 2001) (holding

2 | that plaintiff's allegations of institutional bad faith failed to create an issue on summary

3 | judgment because plaintiff had failed to establish any link between the alleged plan attributed

4 | to Provident and the handling of plaintiff's claim).

5 |       **C.**    **Motion for Summary Judgment on Bad Faith and Punitive Damages**

6 |       To prevail on a claim for insurance bad faith, Plaintiff must prove by a preponderance

7 | of the evidence that the insurer acted unreasonably in the manner in which it processed the

8 | claim, and knew or was conscious that it was acting unreasonably or with a reckless disregard

9 | of the unreasonableness of its actions. Zilisch v. State Farm Mut. Auto Ins. Co., 196 Ariz.

10 | 234, 235, 995 P.2d 276, 277 (2000); Noble v. National Am. Life Ins. Co., 128 Ariz. 188, 190,

11 | 624 P.2d 866, 868 (1981).

12 |       To prevail on his claim for punitive damages, Plaintiff must prove by clear and

13 | convincing evidence that the insurer intended to injure him, or that its conduct was motivated

14 | by spite or ill will, or that the insurer acted to serve its own interests, having reason to know

15 | but consciously disregarding, a substantial risk that its conduct might significantly injure the

16 | insured's rights. Bradshaw v. State Farm Mut. Auto Ins. Co., 157 Ariz. 411, 422, 758 P.2d

17 | 1313, 1324 (1988).

18 |       "[P]unitive damages are recoverable in a bad faith action when the defendant's

19 | conduct is 'aggravated, outrageous, malicious or fraudulent' combined with an evil mind as

20 | evidenced by a showing that the defendant was consciously aware of the needs and rights of

21 | the insured and nevertheless, ignored its obligations." Linthicum v. Nationwide Life Ins.

22 | Co., 723 P.2d 675, 681, 150 Ariz. 326, 332 (1986).

23 |       Plaintiff cites to a number of defendant Unum/Provident's acts that subject it to a bad

24 | faith claim and punitive damages award in this case, against a backdrop of what he calls

25 | "institutional bad faith." This Court will address each alleged act and/or omission in turn.

26 |

27 |

28 |

1

2      1.    **Institutional Bad Faith**

3      Plaintiff argues that Provident took measures to reverse financial disaster in 1994 and

4   increase its profits by more aggressively investigating and managing disability claims,

5   specifically by instituting immediate field review of disability claims, increased surveillance,

6   more independent medical examinations, increased numbers of round table reviews, and

7   specific management of psychiatric claims.

8      Plaintiff offers an undated memo that suggests the psychiatric claims should be

9   completely investigated to "get a better understanding of the claim; a greater ability to

10  recognize denials; and, since there is a larger "gray area in psych claims, there is a greater

11  chance of some type of resolution." Plaintiff also offers a 1995 internal memo stating that

12  "mental/nervous disability claims" had been identified as a "growing claim problem which

13  is difficult to manage," and Provident anticipated an exclusion in new policies "will have a

14  significant impact on profitability."

15     Plaintiff argues that these claims initiatives constituted institutional bad faith by

16  shifting the claim department mission from that of "trying to pay a fair claim" to one of

17  improving the company's bottom line by focusing on ways to avoid payment of claims.  He

18  also offers testimony that claims representatives knew the reserves set aside on their claims,

19  and were eligible for bonuses based on the company's profits.  He claims that this was part

20  of the company's "ongoing plan to increase the company's profits by putting pressure on the

21  claims department to deny more and more claims."

22     Defendants argue that Plaintiff is mistaken, and that the financial difficulties and the

23  internal memos addressing the claims initiative and handling of psychiatric claims were

24  generated by Provident Life & Accident Insurance Co., not The Paul Revere Life Insurance

25  Company or UnumProvident Corp. or the Provident Companies, Inc.  See Reply at p. 12-13.

26     Defendants also argue that Plaintiff has shown no proof of any nexus between the

27  alleged institutional bad faith and the processing of Dr. Ligorsky's claim, and that for this

28

- 19 -

1   reason alone Plaintiff's evidence cannot create an issue for trial citing <u>Cardiner v. Provident</u>

2   <u>Life & Accident</u>, 158 F. Supp. 2d 1088, 1006 (C.D. Calif. 2001) (holding that plaintiff's

3   evidence of an alleged conspiracy by Provident to improperly use claim department to

4   increase profitability, even if accepted, did not create an issue for trial because plaintiff had

5   failed to establish any link between his specific claim and the alleged conspiracy).

6       **2.    Field Investigation**

7       Plaintiff argues that defendants misstated the purpose of the initial interview of Dr.

8   Ligorsky by a field representative as "strictly good will" when the field representative was

9   instructed to inquire into information that might support denial of Plaintiff's claim.

10      The evidence, however, shows that the purpose of the visit was identified as "strictly

11  good will," but also to "gather some specific information concerning [Dr. Ligorsky's]

12  disability" and answer any questions he might have.  Moreover, Plaintiff does not complain

13  about the conduct of the visit itself, or any of the information obtained on the field visit.

14      **3.    Round Table Review**

15      Plaintiff argues that defendants decided at a round-table review to obtain an early

16  independent medical examination and conduct surveillance the weekend of plaintiff's

17  daughter's wedding. They rely on Dr. Feist's testimony that "my impression was" that round

18  table reviews were being conducted "to try to find some way to terminate the claim" to

19  support their argument that this round-table review and the decisions reached at the round

20  table review were conducted in bad faith.

21      This Court has determined that Dr. Feist's testimony is inadmissible.

22      **4.    Surveillance**

23      Plaintiff argues that the decision to conduct surveillance of Dr. Ligorsky's daughter's

24  wedding the weekend of October 7-10, 1999, was unreasonable and improper. Plaintiff further

25  argues that the decision not to submit the surveillance tape to the independent medical

26  examiners on December 1, 1999, "when it became clear that it supported plaintiff's disability"

27  was "outrageous conduct.

28

- 20 -

1        Plaintiff also cites testimony from the independent private investigator that he failed

2    to "get the goods" on Plaintiff. The investigator, however, testified that the term "get the

3    goods" was solely his own, and no one from Provident had suggested anything along those

4    lines. He was instead directed to "just do your job and get as much videotape as humanly

5    possible, and they make their decision."

6        Defendants argue that Dr. Ligorsky had reported that he worked out at the gym daily,

7    had a personal trainer, traveled to France 10 days in July, spent a week with his daughter in

8    Hawaii in August, had flown to Los Angeles recently to help one of his daughters move and

9    set up an apartment, and "was responsible for all the arrangements" for his daughter's

10   wedding, and that "this very active lifestyle" appeared inconsistent with the claim that he was

11   totally disabled by depression. Surveillance is a reasonable investigative technique under the

12   circumstances.

13       Defendants also argue that the surveillance tape probably was not sent the IME doctors

14   because it did not show much.

15       **5.    The Request for IMEs**

16       Plaintiff argues that UnumProvident attempted to bias the IME doctors by failing to

17   disclose the surveillance videotape, by contacting Dr. Pitt by telephone in advance of the IME,

18   by providing a "slanted, biased summary filled with innuendo," and by directing Dr. Pitt "do

19   not offer an ultimate opinion regarding total or partial disability" and "please comment on

20   clinical factors (motivation to return to work, secondary gain, etc.) that may impact insured's

21   disability claim."

22       Plaintiff has not offered any evidence to suggest that the purpose of this phone call to

23   Dr. Pitt in advance of the IME was improper. Plaintiff cites to testimony that it was the

24   practice of the UnumProvident employee who set up the IME to run a case past multiple

25   psychiatrists before selecting one to perform the IME in a particular case, but that he does not

26   recall whether he did so in this case (Plaintiff failed to submit the testimony itself as evidence,

27   however). Defendant has offered testimony that another reason the call is made is to

28

1    determine whether any conflicts of interest exist between the doctor and the insured and the

2    insured's attending physician.  Plaintiff has not suggested that the selection of Dr. Pitt to

3    perform the IME was in any way improper or unreasonable.

4            Plaintiff also argues that the UnumProvident employee responsible for setting up the

5    IME "does not believe that the object of an IME should necessarily be to get an independent

6    and objective second opinion." The employee, however, explained that there "are times the

7    purpose of the IME is to gather information that has not been forthcoming either by the

8    claimant or their attending physician."  When he was asked directly if he believed the IME

9    physician should be free of bias, he responded affirmatively.

10           UnumProvident's admonition to Dr. Pitt in part not to offer an opinion on the ultimate

11    issue of total disability but to address whether secondary gain issues might be motivating Dr.

12    Ligorsky does not appear to this Court unreasonable under circumstances.

13           Plaintiff's also complained that UnumProvident's summary of Dr. Ligorsky's history

14    to the IME doctors was "slanted, biased summary filled with innuendo," specifically

15    suggesting " a suspicion as to the timing of the filing of Dr. Ligorsky's claim and includes a

16    statement of things that appear inconsistent," and thus attempted to bias Dr. Pitt's and Dr.

17    Willson's opinions.  Dr. Pitt testified that he perceived a bias in the letter as well.

18           Defendants argue that they were simply attempting to be upfront with the IME doctors

19    regarding the inconsistencies they perceived, so that the doctors could respond accordingly.

20    6.      **Termination of Benefits**

21           Finally, Plaintiff argues that termination of Dr. Ligorsky's benefits on May 2, 2000,

22    was unreasonable in the face of all of the information UnumProvident had from its field

23    investigator, his medical partner, his treating physician Dr. Udelman, the surveillance, and the

24    reports from the IME doctors. Plaintiff argues that even the IME doctors selected by Provident

25    confirmed that Dr. Ligorsky was not malingering and was in need of further treatment.

26    Plaintiff cites to the impressions from the field investigator, Dr. Ligorsky's partner, and the

27    surveillance that Dr. Ligorsky showed signs of depression, and to Dr. Udelman's opinion that

28

- 22 -

1   Dr. Ligorsky would suffer a deterioration of his clinical status if he attempted to return to his

2   occupation.    Plaintiff also cites to Dr. Willson's statements that Dr. Ligorsky was still

3   suffering from a moderately severe level of depression with anxiety, that there was a mild-

4   moderate suicide risk, and that he was in need of further treatment. Plaintiff cites to Dr. Pitt's

5   opinion that Dr. Ligorsky was not malingering, that it was premature to come to any

6   conclusions as to whether Dr. Ligorsky could or could not return to work, and that Dr.

7   Ligorsky would need aggressive therapy to do so.

8          Finally, Plaintiff cites to the termination letter itself, which states in summary:

9          At this time it appears that you may be able to return to work with additional treatment.
           Therefore, we conclude that you no longer meet the definitions of total disability as
10         outlined by all four of your contracts.

11  Plaintiff argues that this letter does not suggest that Dr. Ligorsky "is able to return work now,"

12  and thus is not supported by any reasonable basis.

13         Defendants argue that they had a reasonable basis to deny Dr. Ligorsky's benefits

14  based on Dr. Pitt's conclusion that plaintiff had a Global Assessment of Functioning (GAF)

15  between 70-80, which means "no more than slight impairment in . . . occupational . . .

16  functions, and that:

17         Dr. Ligorsky's current symptoms do not, at this time, limit his ability to function
           occupationally.  That is, from a purely phenomenologic basis, there is nothing about
18         Dr. Ligorsky's current presentation that limits him from practicing his chosen
           occupation.
19

20  They also cite to Dr. Willson's conclusion that plaintiff "appears to be experiencing a slowly

21  resolving Major Depression with anxiety features also prominent," and that his "anxiety and

22  somatic symptoms are almost certainly psychosomatic, given his own report of complete

23  remission when he was on a vacation out of the country." Finally, they cite to Dr. Anfang's

24  opinion that "While [Dr. Ligorsky] may make a reasonable choice. . . not to return to the

25  increasingly stressful practice of managed medicine, this is not a restriction of significant

26  functional impairment due to active psychiatric symptoms."

27

28

- 23 -

1

2      **7.    Insult and Personal Abuse**

3      Plaintiff also complains that Mr. Iannetti questioned his veracity even after Dr. Pitt had

4      opined that Dr. Ligorsky was not malingering, by saying, "Dr. Ligorsky, if you want to create

5      for yourself a new lifestyle and you want Dr. Udelman to provide that for you, the insurance

6      company doesn't have to pay for that."

7      Plaintiff offers this testimony to support a punitive damages award, citing <u>Farr</u>, 145

8      Ariz. at 8-9, 699 P.2d at 383-84.

9      **8.    Concealment**

10     Plaintiff argues that defendants "have also been caught in concealing and destroying

11     documents." Defendants, however, argue that Plaintiff made the same accusations in his

12     Fourth Motion to Compel, and the Magistrate Judge denied the portion of that motion dealing

13     with these accusations. <u>See</u> Minute Entry and Order filed August 22, 2002. This Court will

14     not revisit the Magistrate Judge's Order.

15     None of the Plaintiff's eight claims, when viewed in isolation, would support in itself

16     a bad faith or a punitive damages. claim. Viewing the evidence in the light most favorable

17     to Plaintiff, as this Court must on a summary judgment motion, the Court finds that a

18     reasonable juror might arguably find that the insurer acted unreasonably in the manner in

19     which it processed Dr. Ligorsky' claim, and knew or was conscious that it was acting

20     unreasonably or with a reckless disregard of the unreasonableness of its actions. <u>See</u> <u>Zilisch</u>

21     <u>v. State Farm Mut. Auto Ins. Co.,</u> 196 Ariz. 234, 235, 995 P.2d 276, 277 (2000); <u>Noble v.</u>

22     <u>National Am. Life Ins. Co.,</u> 128 Ariz. 188, 190, 624 P.2d 866. 868 (1981). Summary

23     judgment is therefore inappropriate on the bad faith claim.

24     However, to prevail on his claim for punitive damages, Plaintiff must prove by clear

25     and convincing evidence that the conduct was 'aggravated, outrageous, malicious or

26     fraudulent' combined with an evil mind as evidenced by a showing that the defendant was

27     consciously aware of the needs and rights of the insured and nevertheless, ignored its

28

- 24 -

1  obligations." <u>Linthicum v. Nationwide Life Ins. Co.</u>, 723 P.2d 675, 681, 150 Ariz. 326, 332

2  (1986). Even viewing the evidence in the light most favorable to Plaintiff, this Court

3  concludes that no reasonable juror could find that the insurer's conduct in this case subjects

4  it to punitive damages, and summary judgment is therefore appropriate on the punitive

5  damages claim.

6      **Accordingly,**

7      **IT IS HEREBY ORDERED** granting Defendant Provident Life's Summary Judgment

8  Motion Re Alter Ego Liability (Dkt. # 77);

9      **IT IS FURTHER ORDERED** granting Defendants' Motion to Exclude Dr. Feist's

10  Testimony (Dkt. # 153);

11      **IT IS FURTHER ORDERED** granting Defendants' Motion to Exclude McSharry's

12  Testimony (Dkt. # 165);

13      **IT IS FURTHER ORDERED** granting in part and denying in part Defendants'

14  Motion for Partial Summary Judgment Re Bad Faith and Punitive Damages (Dkt. # 76);

15      **IT IS FURTHER ORDERED** denying Defendants' Motion for Partial Summary

16  Judgment Re Bad Faith;

17      **IT IS FURTHER ORDERED** granting Defendants' Motion for Partial Summary

18  Judgment Re Punitive Damages.

19  .          DATED this __25th__ day of March, 2003.

20

21          _____

22                  Mary H. Murguia
                United States District Judge

23

24

25

26

27

28

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

VINCENZO MAZZAMUTO,                       :        CASE NO. 1:01-CV-1157

      Plaintiff                              :

                                :        (Judge Conner)

          v.                                 :

UNUM PROVIDENT CORPORATION;  :
PAUL REVERE LIFE INSURANCE
COMPANY; NEW YORK LIFE              :
INSURANCE COMPANY,
                                 :

      Defendants                             :

## M E M O R A N D U M

Before the court are the following motions: 1) defendants' motion in limine to exclude certain evidence from trial (Doc. 47); 2) defendants' motion in limine to bifurcate the trial (Doc. 49); 3) plaintiff's motion in limine to prohibit introduction of evidence concerning plaintiff's stock trading (Doc. 52); 4) plaintiff's motion to reopen discovery, file amended complaint, and extend deadlines (Doc. 74); 5) defendants' motion to file sur reply brief (Doc. 92); 5) defendants' motion to strike affidavit of plaintiff's counsel, Richard C. Angino (Doc. 94); 6) plaintiff's motion for reconsideration of the court's Order dated February 7, 2003 (Doc. 104); 7) plaintiff's motion for reconsideration of the court's Order dated March 17, 2003 (Doc. 121); 8) plaintiff's motion to file an amended complaint (Doc. 105); and 9) defendants' motion for leave to file supplemental brief in opposition to plaintiff's motions for leave to amend the complaint and for reconsideration of the summary judgment order (Doc. 142). The parties have fully briefed the issues, and the matters are ripe for disposition.

## I.   Background

This case arises from defendants' UNUM Provident Corporation ("UNUM"), Paul Revere Life Insurance Company ("Paul Revere"), and New York Life Insurance Company's ("New York Life") denial of plaintiff, Vincenzo Mazzamuto's ("Mazzamuto") claim for long term disability benefits based on back and psychiatric conditions.  Plaintiff filed the instant complaint on June 26, 2001. (Doc. 1).  In his complaint, Mazzamuto alleges common law breach of contract and statutory bad faith pursuant to 42 Pa. C.S.A. § 8371.  Id.

## II.   Defendants' Motion in Limine to Exclude Evidence at Trial

### A.   Dr. McSharry's Testimony

Defendants move the court to exclude the testimony and deposition of Dr. McSharry, plaintiff's proposed expert witness.  (Doc. 47).  Trial courts must perform a "gatekeeping" function in order to ensure that all expert testimony heard by the factfinder is both relevant and reliable.  See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993); Oddi v. Ford Motor Co., 234 F.3d 136, 144 (3d Cir. 2000); Hamilton v. Emerson Electric Co., 133 F.Supp. 2d 360, 366 (M.D.Pa. 2001).  Appellate courts review a trial court's decision to admit or exclude expert testimony for abuse of discretion.  Kumho Tire, 526 U.S. at 152, General Electric Co. v. Joiner, 522 U.S. 136, 143 (1997); Elcock, 233 F.3d at 740-41.  A proposed expert must satisfy three requirements before the court  permits his or her testimony to be heard by the factfinder.  First, the court must deem the expert "qualified."  Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000); Oddi, 234 F.3d at 145; In re Unisys Savings Plan Litigation, 173 F.3d 145, 155 (3d Cir. 1999).  Second, the evidence must be based on "reliable" methodology.  Id.  Finally, the proposed expert testimony must "fit" with

2

the subject matter of the case, or "assist the trier of fact" in resolving disputed factual issues. Id.

Dr. McSharry proposes to testify about defendants' alleged "pattern and practice" of denying claims for benefits in bad faith. Plaintiff argues that Dr. McSharry's testimony is relevant to the claim for statutory bad faith which he pled in his original complaint. However, the court's Order dated March 17, 2003 entered summary judgment on behalf of defendants on the bad faith count of plaintiff's complaint. (Doc. 117). Therefore, Dr. McSharry's evidence regarding a possible "pattern and practice" of bad faith benefit denials is irrelevant to the present lawsuit, which now consists of a single breach of insurance contract claim.

Plaintiff asserts that Dr. McSharry's testimony is relevant to plaintiff's individual claim for disability benefits. However, Dr. McSharry does not possess any personal knowledge concerning the facts of plaintiff's individual disability claim. (Doc. 71, Ex. 2). Dr. McSharry's proffered testimony does not "fit" the subject matter of the case, and would not "assist the trier of fact" in resolving the breach of contract claim. Elcock, 233 F.3d at 741; Oddi, 234 F.3d at 145; In re Unisys Savings Plan, 173 F.3d at 155. Therefore, the court will not permit Dr. McSharry to testify as an expert witness at trial. His lack of personal knowledge concerning Mr. Mazzamuto's individual claim for disability benefits prohibits Dr. McSharry from testifying as a fact witness in this matter. See FED. R. EVID. 602. Therefore, the court will grant defendants' motion in limine to exclude the testimony, deposition, and all newspaper articles relating to Dr. McSharry.

3

**B.    Dr. Schneider's Testimony**

Defendants further move the court to exclude the testimony of Dr. Stanley Schneider. (Doc. 47). Dr. Schneider conducted a Clinical Psychological Disability Evaluation of Mazzamuto in July 2001. (Doc. 26, Ex. F). The Social Security Administration ("SSA") utilized this report when adjudicating Mazzamuto's claim for Social Security Disability benefits. (Doc. 26, Ex. G). Plaintiff's counsel designates Dr. Schneider as an expert witness in his pre-trial memorandum dated April 16, 2003 (Doc. 136).

Discovery closed on June 28, 2002. (Doc. 13). Plaintiff's counsel did not identify Dr. Schneider by that date. Federal Rule of Civil Procedure 26(a)(2) requires a litigant to submit a report identifying all expert witnesses. FED. R. CIV. P. 26(a)(2). This report must contain detailed information concerning the proposed expert's qualifications and compensation, along with a complete statement regarding his or her proposed testimony. FED. R. CIV. P. 26(a)(2)(B). Plaintiff has not produced an expert report in compliance with this rule, and defendants argue that such failure is grounds for exclusion. (Doc. 48).

Plaintiff contends that because Dr. Schneider was not retained for the sole purpose of providing expert testimony at trial, the requirements of Rule 26(a)(2) do not apply to his testimony. (Doc. 58). This court has previously held that Rule 26 requirements do not apply to Dr. Bower, who served as Mazzamuto's treating physician for many years. (Doc. 101). See also Bucher v. Gainey Transportation Svc. of Indiana, Inc., 167 F.R.D. 387, 390 (M.D.Pa. 1996) (quoting FED. R. CIV. P. 26 (a)(2)(B) advisory committee's notes). While Dr. Schneider did not act as a "treating physician" when examining Mazzamuto, plaintiff did not employ him for the sole purpose of providing expert testimony at trial. See id.

4

Courts should not impose the extreme sanction of exclusion of evidence absent a showing of willful deception or flagrant disregard of a court order. Id. at 389 (citations omitted). When determining whether an proposed medical expert qualifies as a "treating physician," the court must focus on the substance of the testimony, not the rigid status of the witness. See id. Plaintiff did not employ Dr. Schneider. This witness will base his testimony on his observations of Mazzamuto's mental condition during the July 2001 examination. Moreover, Dr. Schneider provided the functional equivalent of an expert's report in the form of his "Clinical Psychological Disability Evaluation" dated July 13, 2001. (Doc. 26, Ex. F). Consequently, Dr. Schneider's testimony should present no surprise to the defendants. Based upon the unique circumstances surrounding Dr. Schneider's involvement in this matter, the court finds that the strictures of Rule 26(a)(2) do not mandate the exclusion of Dr. Schneider's testimony. Hence, the court will deny defendants' motion in limine to exclude Dr. Schneider's testimony.[1]

### C.    Correspondence Between Counsel

Plaintiff asserts that certain items of correspondence between counsel provide evidence of statutory bad faith. (Doc. 58). The court has entered summary judgment on behalf of defendants on this statutory bad faith claim. (Doc. 117). Mazzamuto does not contend that this correspondence relates to the remaining breach of contract claim. Therefore, the court will grant defendants' motion in limine to exclude the proffered correspondence from trial.

---

[1] However, the court will require plaintiff's counsel to provide opposing counsel with a current curriculum vitae and copies of any documents relied upon by Dr. Schneider in the preparation of his clinical evaluation. Dr. Schneider's testimony will be limited to those matters falling within the fair scope of his clinical evaluation.

5

**D.    The Social Security Administration Disability Determination**

On July 25, 2002, the SSA adjudicated Mazzamuto disabled and entitled to benefits. (Doc. 26, Ex. G). Defendants move to exclude all evidence relating to this determination as irrelevant and unfairly prejudicial.[2] (Doc. 48). They contend that the insurance contract at issue applies a different standard than the SSA when determining whether an individual is qualified to receive benefits. Id. Defendants argue that these disparate standards render the SSA disability determination irrelevant, and that knowledge of the adjudication would unfairly prejudice and confuse the jury. (Doc. 48). In addition, defendants argue that the evidence considered during the determination of plaintiff's insurance contract claim differs from the record examined by the SSA. Id.

According to the policy, an insured is totally disabled if he or she "cannot do the substantial and material duties of his or her regular job." (Doc. 21, Ex. A at p. 699). The SSA finds an individual "disabled" if he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . ." (Doc. 26, Ex. G). While the SSA determination of disability does not control defendants' decision, Mazzamuto's satisfaction of their standard is relevant to the present contract dispute. See Edgerton v. CNA Insurance Co., 215 F.Supp.2d 541, 549 (E.D.Pa. 2002) (although an SSA decision is not dispositive in determining whether an Employee Retirement Income Security Act ("ERISA") administrator's decision to deny benefits is arbitrary and capricious, it is a relevant factor that should be considered).

---

[2]See FED. R. CIV. P. 401, 403

6

While the ERISA "arbitrary and capricious" standard differs from the definition of disability set forth in the contract at issue, it similarly diverges from the SSA criteria. See id. The court finds that the SSA determination of disability is relevant to the present action, and that such relevance outweighs any potential prejudice to defendants. See FED. R. EVID. 401, 403. Therefore, the court will deny defendants' motion in limine to exclude evidence of the SSA determination of disability.

### E.     The Waiver of Life Insurance Premiums

Defendants further argue for the exclusion of evidence that defendant New York Life waived plaintiff's premiums under a separate life insurance policy. (Doc. 47). On June 14, 2002, New York Life waived payment of Mazzamuto's life insurance premiums. (Doc. 26, Ex. H). New York Life waived these premiums because plaintiff satisfied the definition of "total disability" as set forth in this life insurance policy. See id. Defendants contend that evidence of waiver of premiums is irrelevant because materially different definitions of disability govern these separate policies. (Doc. 48).

There appears to be no legal authority directly on point within the Third Circuit on this issue. Defendants cite two cases which hold that waiver of life insurance premiums based on disability does not estop an insurer from denying benefits under a separate disability policy. See Bucks v. Reliance Standard Life Ins. Co., 2000 WL 659029 (6th Cir. 2000); Gonyea v. John Hancock Mutual Life Ins. Co., 812 F.Supp. 445 (D.Vt. 1993). However, neither case stands for the proposition that exclusion of the evidence in question is somehow required under Rule 403.

While New York Life's decision to waive life insurance premiums does not require a favorable disability benefit determination, the court finds that it is

7

relevant evidence which the jury should consider. See id. Under Rule 403, the court

finds that the probative value of this evidence outweighs the potential prejudice to

the defendants who are free to explain the different nuances of policy language to the

jury. See FED. R. CIV. P. 403. Therefore, the court will deny defendants' motion in

limine to exclude New York Life's waiver of life insurance premiums.

**III.         Defendants' Motion in Limine to Bifurcate the Trial**

Defendants move the court to bifurcate the issues of liability and

punitive damages at trial. (Doc. 50). Plaintiff did not oppose this motion. (Doc. 56).

Plaintiff originally requested punitive damages under a statutory bad faith claim.

(Doc. 1). However, in an Order dated March 17, 2003, the court entered summary

judgment in favor of defendants on this bad faith claim. (Doc. 117). Only a breach of

contract claim remains to be tried. Therefore, the court will dismiss defendants'

motion in limine to bifurcate the trial as moot.

**IV.         Plaintiff's Motion in Limine to Exclude all Evidence Regarding
               Mazzamuto's Stock Trading**

Plaintiff moves the court to exclude all evidence regarding the stock

trading conducted by Mazzamuto after the onset of his alleged disability. (Doc. 52).

Mazzamuto submitted a claim for disability benefits based on a back condition and

an emotional disorder. Id. This emotional disorder allegedly creates severe anxiety

and difficulty concentrating, which prevents Mazzamuto from performing

managerial duties at his pizza restaurant. Id. After he ceased working due to these

alleged conditions, Mazzamuto began trading stocks on the Internet. (Doc. 22, Ex. C

pp. 49-54). Plaintiff alleges that the court should exclude all evidence regarding this

stock trading because it is irrelevant and highly prejudicial. See FED. R. EVID. 401,

403.

8

Federal Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401. Courts must admit all relevant evidence unless another rule requires its exclusion. Id. In the present action, plaintiff alleges that his anxiety and inability to concentrate render him incapable of performing the substantial and material duties of his past occupation. (Doc. 52 & Doc. 21, Ex. A at p. 699). His ability to perform these duties is central to the present breach of contract action. Evidence that plaintiff engaged in online stock trading is clearly relevant to the plaintiff's functional ability. See FED. R. CIV. P. 401. Therefore, the court finds that the evidence of plaintiff's stock trading is relevant to this matter.

Mazzamuto further argues that any probative value of this evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. FED. R. EVID. 403. Evidence of plaintiff's activities after a claim of disability, if significant, may be harmful to plaintiff's case. Such harm, however, does not require exclusion of the evidence unless the evidence would cause unfair prejudice or confusion. Indeed, two recent cases in this circuit have relied, in part, on evidence of the plaintiff's post-disability claim activities. See Russell v. Paul Revere Life Ins. Co., 148 F.Supp.2d 392, 404 (D.Del. 2001), aff'd, 288 F.3d 78 (3d Cir. 2002); Orvosh v. Program of Group Ins. For Salaried Employees of Volkswagon of America, Inc., 222 F.3d 123 (3d Cir. 2000).

Plaintiff fears that the jurors will regard Mazzamuto as a wealthy man if they hear evidence of six million dollars of stock trades. However, such evidence is probative of Mazzamuto's functional capacity and corresponding ability to perform his occupational duties. Plaintiff will have ample opportunity to explain his stock

9

trading and to reconcile the same with his alleged anxiety and concentration problems on direct examination, thereby eliminating any potential confusion of the issues. In light of these circumstances, the court concludes that plaintiff is not *unfairly* prejudiced by admission of evidence of plaintiff's stock trading. To the extent any such prejudice exists, it is far outweighed by the probative value of this evidence. Therefore, the court will deny plaintiff's motion in limine to exclude all evidence regarding plaintiff's stock trading.

V.        **Plaintiff's Motion to Reopen Discovery, File an Amended Complaint, and Extend Deadlines**

Mazzamuto moves the court to reopen discovery in order to explore a potential "pattern and practice" bad faith claim against defendants. (Doc. 74). The amended case management order mandated completion of discovery by June 28, 2002. (Doc. 13). Trial in this matter was originally scheduled to commence on May 5, 2003. (Doc. 98).[3] In August 2002, plaintiff's counsel "learned that defendant UNUM Provident was potentially guilty of unfair and fraudulent insurance practices." (Doc. 74). He seeks permission to file an amended complaint, extension of deadlines, and the reopening of discovery. Id. Plaintiff intends to prove his claim for bad faith insurance practices through the testimony of Dr. McSharry, news reports, and decisions in other cases involving defendants. Id.

The Federal Rules of Civil Procedure encourage discovery deadlines to ensure a prompt determination of every civil action. See Fidelity Deposit Co. v. McCulloch, 168 F.R.D. 516, 526 (E.D.Pa. 1996). Any decision to reopen discovery in this matter, or allow amendment of the complaint at this late stage of litigation,

---

[3]Because of another pending matter (a seven day malpractice trial), trial in this matter was postponed. The court has scheduled a phone conference to set a new trial date as soon as practicable.

10