27. *The contractual and/or other basis and reasons(s) for the increase and/or commencement of payment of any amount of payment(s) received by the Paul Revere Insurance Company from the Equitable Life Assurance Society of the United States, for administration of the claim for disability insurance benefits presented by Noble Gabriel, after Paul Revere terminated the disability insurance benefits which were being paid to Noble Gabriel pursuant to claim(s) for benefits with regard to his disability insurance policy(ies) with the Equitable Life Assurance Society of the United States, for the years 1998 through 2002.*

30. *The formula for payment to The Paul Revere Life Insurance Company from the Equitable Life Assurance Society of the United States, pursuant to any administration and marketing agreement, coinsurance agreement, co-marketed business and coinsurance agreement, administration agreement, and/or any other such service agreement, which governed the administration of the claim(s) for disability insurance benefits presented to Equitable by Noble Gabriel, and administered by Paul Revere, for the years 1993 through 2002.*

31. *The amount of payment(s) received by The Paul Revere Life Insurance Company from the Equitable Life Assurance Society of the United States, for administration of all disability claims for Equitable pursuant to any administration and marketing agreement, coinsurance agreement, co-marketed business and coinsurance agreement, administration agreement, and/or any other such service agreement, for the years 1993 through 1998.*

32. *The contractual and/or other basis and reasons(s) for any amount of payment(s) received by The Paul Revere Life Insurance Company from the Equitable Life Assurance Society of the United States, for administration of all disability claims for Equitable pursuant to any administration and marketing agreement, coinsurance agreement, co-marketed business and coinsurance agreement, administration agreement, and/or any other such service agreement, for the years 1993 through 1998.*

These topics are irrelevant to the material issues in this case. Furthermore, the scope of those requests that are not limited to the time frame of the administration of Dr. Gabriel's claim (to 1998), are overly broad in time; each of these requests are overly broad in scope; and they are unduly burdensome.

Moreover, there is absolutely no reason to convene another deposition to address any of these topics. For most of the topics above, Dr. Gabriel has been provided with the contractual agreement s between Paul Revere and Equitable, which set forth the extent of the companies' relationship. He has also deposed Equitable's corporate designee about those documents. This

is simply Dr. Gabriel's attempt to get several more bites at an apple that he believes he did not fully eat when he took Equitable's 30(b)(6) deposition. For the additional topics (i.e., the total number of claims handled by Paul Revere), if he had wanted to have this information, there is no reason that he could not have inquired of Equitable's 30(b)(6) designee about it. Having not done so, he must not now be permitted to conduct another deposition to finish the work he finds he has left unfinished. This is especially true since these issues bear no relevance to the material claims in his case against Equitable.

> 28.    The amount of reserves set aside and/or otherwise accounted for by The Paul Revere Life Insurance Company pursuant to any administration and marketing agreement, coinsurance agreement, co-marketed business and coinsurance agreement and/or any other such service agreement between The Paul Revere Life Insurance Company and the Equitable Life Assurance Society of the United States, with regard to the claim(s) for disability insurance benefits from Equitable presented by Noble Gabriel, for the years 1993 through 1998.

> 29.    The amount of reserves set aside and/or otherwise accounted for by The Paul Revere Life Insurance Company pursuant to any administration and marketing agreement, coinsurance agreement, co-marketed business and coinsurance agreement and/or any other such service agreement between The Paul Revere Life Insurance Company and the Equitable Life Assurance Society of the United States, with regard to the claim(s) for disability insurance benefits from Equitable presented by Noble Gabriel, after the disability insurance benefits from Equitable to Noble Gabriel were terminated by Paul Revere, for the years 1998 through 2002.

There is no need to convene another deposition to address these topics. Reserves are a well-known topic in insurance cases. Indeed, Dr. Gabriel inquired extensively of Equitable's 30(b)(6) designee about reserves. (See Exhibit D, Casill Depo., pp. 52-54, 56-57, 61-64, 66-70, and 136-138.) Through Mr. Casill's deposition testimony it was clear that reserves on claims filed with Equitable (as was Dr. Gabriel's) are made by Equitable, not by Paul Revere.

"The Equitable is obligated to set up a reserve..." Exhibit D, Casill Depo., p. 135. Dr. Gabriel also learned from this deposition that "... at some point after denial, ..., the company is no longer obligated to hold the disabled life reserve for that policy. ... The disabled life reserve

would go to zero." Exhibit D, Casill Depo., p. 136-7.  Given Mr. Casill's testimony on behalf of

Equitable with regard to reserves, there is no reason for Dr. Gabriel to depose Paul Revere on

these topics.

In addition, these topics are irrelevant to any material issue in this case.  Paul Revere did

not set or "otherwise account for" reserves.  Reserves on Equitable's policies were set by

Equitable.  Therefore, Dr. Gabriel's motion to compel Paul Revere's 30(b)(6) deposition on these

topics should be denied.

### III.    CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, The Equitable Life Assurance Society of the United States

requests that this Court deny Plaintiff's Motion to Compel Rule 30(b)(6) Deposition of the non-

party, The Paul Revere Life Insurance Company.  Dr. Gabriel's notice is untimely, objectionable

and seeks information which has no bearing whatsoever ion the issues in this case.

THE EQUITABLE LIFE ASSURANCE
SOCIETY OF THE UNITED STATES

By its attorneys,

*Elizabeth Greene*

Joseph M. Hamilton, BBO #546394
Elizabeth L. B. Greene, BBO #561456
Mirick, O'Connell, DeMallie & Lougee, LLP
100 Front Street
Worcester, MA 01608-1477
Phone: (508) 791-8500
Fax:    (508) 791-8502

Dated: 5/28/03

### CERTIFICATE OF SERVICE

I, Elizabeth L. B. Greene, hereby certify that I have this day served a copy of the foregoing document, by mailing a copy, first class mail, postage prepaid, to Timothy R. Cagle, Esq., 23 Main Street, Suite 240, Andover, MA, 01810.

*Elizabeth Greene*

Elizabeth L. B. Greene

Dated: 5/28/03.

[H:\PA\Lit\1767\00001\A0634912.DOC]

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WILLIAM A. MANN,
                    Plaintiff        :        CIVIL ACTION
                                     :
                                     :
            v.                       :
                                     :
UNUM LIFE INSURANCE COMPANY          :
OF AMERICA, at al.                   :
                    Defendants       :        NO. 02-1346

MEMORANDUM

McLaughlin, J.                          March 19 , 2003

        Before the Court are three issues that have been raised
by the plaintiff's motion in limine, the plaintiff's motion to
compel, or the defendants' motion for a protective order.  These
issues are: whether the plaintiff should be allowed to introduce
at trial the videotaped testimony of Dr. Patrick Fergal McSharry,
a former employee at the Chattanooga office of one of the
defendants; whether the defendants shall be required to produce
statistical information about the defendants' handling of other
claims; and whether the defendants shall be compelled to produce
information about the impact of reserves on the defendants'
profitability, the defendants' general reserve setting and
release procedures, and the specific reserve amount set for the

1

plaintiff's claim[1].

Because the plaintiff has not shown that the testimony
of Dr. McSharry is relevant and because its admission would
violate other rules of evidence, the Court denies the motion in
limine.  The Court also denies the plaintiff's motion to compel
statistical information.  The Court grants the portion of the
motion for a protective order that relates to the reserve
information[2].

[1]  Motion in Limine- Dr. McSharry's Testimony

The plaintiff's complaint presents a claim of bad faith
under 42 Pa. C.S.A. § 1871.  To succeed on this claim, the
plaintiff must prove that the defendant insurer lacked a
reasonable basis for denying benefits to the plaintiff, and that
the insurer knew of, or recklessly disregarded, its lack of a
reasonable basis.  Tereletsky v. Prudential Property and Casualty
Ins. Co., 649 A.2d 680, 688 (Pa. Super. 1994).

---

[1]    The motion in limine seeks the admission of Dr.
McSharry's testimony.  The plaintiff's motion to compel requests
the statistical information.  The defendants raised the reserve
information issues in their motion for a protective order in
response to the plaintiff's requests for such information.

[2]The motion for a protective order also raised an issue
regarding timeliness of the notice of the deposition at issue.
The defendants have agreed to set aside this issue.  In the order
accompanying this memorandum, the Court denies this part of the
motion for a protective order as moot.

2

The plaintiff has also pled and is pursuing a claim for breach of contract.  In order to prove this claim, the plaintiff must show that 1) there was a contract between the defendant and the plaintiff; 2) the defendant breached a duty imposed by that specific contract; and 3) damages resulted.  <u>J.F. Walker Co. inc. v. Excalibur Oil Grp.</u>, 2002 Pa. Super. 39 (2002).

Both of these claims focus on the defendants' conduct towards the plaintiff specifically, not the defendants' general conduct.  The Court finds that the testimony of Dr. McSharry is not relevant to either of these claims because the testimony relates only to the general business practices of the defendants, not to the handling of the plaintiff's claim.

I agree with the reasoning of Judge Cahn in <u>Hyde Athletic Indus. Inc. v. Continental Casualty Co.</u>, 969 F. Supp. 289, 307 (E.D. Pa. 1997).  The bad faith statue addresses only whether the insurer acted recklessly or with ill will towards the plaintiff in a particular case, not whether the defendants' business practices were generally reasonable.  This reasoning also applies to the plaintiff's breach of contract claim, which relates only to the terms of any contract between the parties and not the defendants' general business practices.  Unless the plaintiff can show a link between his specific case and the allegedly unreasonable general business practices, such practices

3

are irrelevant to the plaintiff's claim. <u>See</u> <u>Kosierowski v.</u>

<u>Allstate Ins. Co.</u>, 51 F. Supp. 2d 583 (E.D. Pa. 1999)(granting

summary judgment in bad faith case despite evidence of

defendant's use of flawed computer program because no evidence of

a link between the computer program and the handling of

plaintiff's claim).

Dr. McSharry's testimony is relevant only to the

general reasonableness of the defendants' procedures, not to the

handling of the plaintiff's claim or to the purported breach of

any contract between the parties.

It is undisputed that Dr. McSharry was not involved in

and had no knowledge of the handling of the plaintiff's claim.

The plaintiff argues that Dr. McSharry's testimony is still

relevant, however, because it provides evidence of a company-wide

policy in place in all of the defendants' offices, which was then

applied to the plaintiff's claim.  There is no evidence that

there was a company-wide policy or that such a policy was applied

to the plaintiff's case.

Dr. McSharry testified at length about the claim review

practices employed by the Chattanooga office.  It is clear from

Dr. McSharry's testimony that his knowledge relates only to his

4

personal experience in that office[3].  There is no evidence that ·
the unwritten patterns and practices followed by those in the
Chattanooga office were the general business practices of the
company as a whole.  Dr. McSharry does not state or allege that
the practices were based on company-wide policy or were engaged
in pursuant to orders from anyone outside the Chattanooga office.
The plaintiff has presented no other evidence that would indicate
that those reviewing the plaintiff's claim engaged in the same
practices about which Dr. McSharry testified.  Without any
indication of a link to the instant case, Dr. McSharry's
testimony is irrelevant and inadmissible.

In addition to being irrelevant, Dr. McSharry's
testimony would inject several additional issues into the trial.
These issues include evidence about Dr. McSharry's employment and
termination, his own lawsuit against the defendants, and about
the patterns and practices of the Chattanooga office and those
with whom Dr. McSharry worked.  The undue delay, waste of time,
and potential confusion of the issues that would result far
outweigh any probative value the testimony has, mandating its
exclusion under Federal Rule of Evidence 403.

Additionally, it is questionable whether the plaintiff

---

[3]The plaintiff's claim was not handled through that office
or by individuals associated with that office.

5

has met the requirements for the admission of hearsay deposition testimony under Federal Rule of Evidence 804(b).

Under this Rule, former testimony may be admitted if the declarant is unavailable. The plaintiff argues that Dr. McSharry is unavailable because Magistrate Judge Wulliam B. Mitchell Carter of the District Court for the Eastern District of Tennessee has issued an order stating that no further depositions of Dr. McSharry would be taken without the express prior permission of that court. In order to get this permission, the party wishing to depose Dr. McSharry must petition the court and show why the additional testimony is necessary.

The plaintiff has not petitioned Magistrate Judge Carter for permission to depose Dr. McSharry. Because the plaintiff has not explored this avenue of obtaining Dr. McSharry's testimony, it would be premature to find that the testimony cannot be procured by process or other reasonable means.

It is also questionable whether the plaintiff has demonstrated that the defendants had the motive and opportunity to develop the testimony of Dr. McSharry as required by Rule 804(b)(1). The deposition testimony at issue was taken as part of six separate lawsuits, unrelated to this case, filed against the defendants and other affiliates. The defendants allege that

6

cross-examination was cut off before it was complete, at the end
of one and one-half days.  It is questionable whether one and
one-half days is sufficient to fully develop the testimony of a
witness who has been subpoenaed for deposition in at least twenty
claims against the defendants.

          In addition to showing that the defendants had the
opportunity to develop Dr. McSharry's testimony, the plaintiff
also has to show that "the earlier treatment of the witness is
the rough equivalent of what the party against whom the statement
is offered would do at trial if the witness were available to be
examined by the party."  Kirk v. Raymark Indus., 61 F.3d 147, 166
(3d Cir. 1995), cert. denied 516 U.S. 1145 (1996).  It is not
clear that the defendants had the same motive to cross-examine
Dr. McSharry during the deposition as they would have in this
case, which involves a claimant, claim, and claims handling
office that are different from those in the cases at issue in the
deposition[4].

_____

          [4]The plaintiff also alleges that the testimony is admissible
under Federal Rule of Civil Procedure 32.  Rule 32, however,
allows the admission in one case of a deposition taken in a
different case only where the parties and the subject matter of
the two cases are the same.  Neither of these requirements are
met in this case - the parties are different, as is the subject
matter.  Some courts in other circuits have allowed deposition
testimony to be introduced although these two requirements were
not strictly met.  See Wright, et al., Federal Practice &
Procedure, § 2150 n 9 (collecting cases)  Even in those cases,

7

## II.  Motion to Compel - Statistical Information

          The plaintiff seeks discovery of statistical

information about numerous claims that are factually distinct

from the claim at issue in this case.  Even if the plaintiff

could use this statistical information to show that the

defendants engaged in inappropriate behavior towards other

claimants, this would be evidence only of a general business

practice.  The statistical evidence, like Dr. McSharry's

testimony, would have no bearing on the plaintiff's specific

claim.  This information is therefore irrelevant and not

discoverable.


## III.  Motion to Quash - Reserve Information

          The plaintiff seeks to discover information about: (1)

the initial claim reserve set for the plaintiff's claim and any

adjustments made to that reserve; and (2) information about the

companies' general reserve setting policies, including

information about reserve setting and release procedures and the

impact of reserves on the companies' financial status.  The

--------------------

however, the courts required that the proponent of the testimony
show that the other had the same motive to cross-examine the
witness in the deposition as they would have in the trial.  Id.

8

defendants have moved for a protective order to prevent the
plaintiff from discovering this information.

The plaintiff argues that the amount of the individual
reserve is relevant because it reflects the value that the
defendants put on the claim.  He argues that the general reserve
setting and release policies and the impact of reserves on the
companies' financial status are relevant to show that the
companies have an incentive to deny claims with a high reserve to
improve its financial status.  The defendants argue that the
reserve information sought is irrelevant and protected by the
work product doctrine.

A.  <u>Specific Reserve Set for the Plaintiff's Claim</u>

The defendants have stated, and the plaintiff does not
dispute, that the reserve for the plaintiff's claim was initially
set in accordance with the Pennsylvania Insurance Commissioner's
regulations.  The amount of the initial reserve set is therefore
irrelevant to the plaintiff's claim.  If the reserve was set
according to the regulations, the defendants had no discretion in
setting the amount of the reserve, and the reserve amount is not
a reflection of the defendants' judgment about the value of the
claim.  The amount of the reserve required by the regulations is
not otherwise relevant to the plaintiff's bad faith or contract

9

claims. The amount of the initial reserve is, therefore, not
discoverable.

After the initial reserve was set, the reserve amount
was adjusted as the case progressed. The plaintiff seeks
discovery of these modifications to the reserve. This
information is not discoverable because it is protected work
product.

Materials prepared in anticipation of litigation that
reflect the mental impressions, conclusions, opinions, or legal
theories of an attorney or other representative of a party
concerning litigation are not discoverable. Fed. R. of Civ. P.
26(b)(3); see also Hickman v. Taylor, 329 U.S. 495 (1947).

The defendants have stated, and the plaintiff has not
disputed, that any adjustments made to the reserve after the
initial reserve was set were made upon input by the defendants'
legal department. The reserve adjustments reflect the thoughts
and conclusions of the defendants' legal department or other
employees about the value of the claim in light of the potential
or pending litigation, including consideration of such factors as
the likelihood of success in litigation and the cost of defending
the claim. Any adjustments to the initial reserve reflect the
mental impressions, thoughts, and conclusions of the defendants'
legal department and other employees. Such information is

10

legal department and other employees.  Such information is

protected opinion work product and is not discoverable.  <u>See</u>

<u>Simon et al. v. G.D. Searle & Co.</u>, 816 F.2d 397, 401-02 (8th Cir.

1987)(reserve information is protected by the work product

doctrine); <u>Rhone-Poulenc Rorer, Inc. v. The Home Indemnity Co. et</u>

<u>al.</u>, 139 F.R.D. 609, 614-15 (E.D. Pa. 1991)(same); <u>Leksi, Inc. v.</u>

<u>Federal Ins. Co. et al.</u>, 129 F.R.D. 99, 106 ( D. N.J.

1989)(same).


B.  <u>General Reserve Information</u>

     The information about the defendants' general reserve

setting procedures and financial information is also not

discoverable.  This information would demonstrate the general

business practices of the defendants and would only be relevant

to the plaintiff's claim if he could demonstrate a link between

the reserve policies and the plaintiff's claim.  Because the

information about the specific reserve set in the plaintiff's

claim is not discoverable, there is no way that the plaintiff can

demonstrate this link.  Without the specific reserve information,

the general reserve information is irrelevant and not

discoverable.


     An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WILLIAM A. MANN,                    :        CIVIL ACTION
                    Plaintiff       :
                                    :
            v.                      :
                                    :
UNUM LIFE INSURANCE COMPANY         :
OF AMERICA, at al.                  :
                    Defendants      :        NO. 02-1346

ORDER

AND NOW, this 19th day of March, 2003, upon

consideration of the plaintiff's motion in limine (Docket # 19),

the plaintiff's renewed motion to compel (Docket # 26), and the

defendants' motion for a protective order (Docket # 31), and

following oral argument on January 23, 2003, IT IS HEREBY ORDERED

that, for the reasons explained in a memorandum of today's date,

the motion in limine is DENIED, the motion to compel is DENIED,

the portion of the motion for a protective order that relates to

the plaintiff's requests for reserve information is GRANTED, and

the portion of the motion for a protective order that relates to

the timeliness of the corporate designee notice is DENIED AS

MOOT.

BY THE COURT:

_____
MARY A. MCLAUGHLIN,   J.

1

Page 1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF CONNECTICUT
 2

 3

 4   JOHN DOE,
             Plaintiff,
 5                                        Civil Action No.
     VS.                                  3:00 CV-01096(SRU)
 6
     UNUMPROVIDENT CORPORATION f/k/a
 7   PROVIDENT COMPANIES, INC.,
     THE PAUL REVERE LIFE INSURANCE
 8   COMPANY, PROVIDENT LIFE AND
     ACCIDENT INSURANCE COMPANY OF
 9   AMERICA and JOHN HANCOCK MUTUAL
     LIFE INSURANCE COMPANY,
10           Defendants.

11

12

13

14        DEPOSITION of LINDA J. BRISETTE taken at the

15   request of the Plaintiff pursuant to Rule 30 of

16   the Federal Rules of Civil Procedure before

17   Carol A. Jeffrey, Registered Merit Reporter, a

18   notary public in and for the Commonwealth of

19   Massachusetts, on March 13, 2003, commencing at

20   9:00 A.M. at the offices of McCarthy Reporting

21   Service, 12 Harvard Street, Worcester,

22   Massachusetts.

23

24
```

Page 2

```
 1   A P P E A R A N C E S:

 2

 3   FOR THE PLAINTIFF:

 4   JONATHAN KATZ, ESQ.
     JACOBS, GRUDBERG, BELT & DOW, P.C.
 5   350 Orange Street
     New Haven, Connecticut  06503
 6

 7

     FOR THE DEFENDANTS:
 8
 9   THEODORE J. TUCCI, ESQ.
     ROBINSON & COLE, LLP
     280 Trumbull Street
10   Hartford, Connecticut 0610-3597

11       -and-

12   PATRICIA BIANCO WILLIS, ESQ.
     UNUMPROVIDENT CORPORATION
13   18 Chestnut Street
     Worcester, Massachusetts  01608

14

15

16

17

18

19

20

21

22

23

24
```

Page 25

1  direct contact with him?

2   A.  As far as working?

3   Q.  Yes.

4   A.  I've seen him, I've said hi to him in

5  the hall, but as far as working with him, I

6  don't think I've ever sat down with him to do

7  any particular work dealing with him.

8   Q.  Is he still in the Worcester office,

9  do you know?

10   A.  I think he is here now.

11   Q.  Okay.  And does Paul Revere have one

12  building in Worcester or are there multiple

13  offices, do you know?

14       MR. TUCCI:  Hard question to answer.

15   A.  It's two buildings connected by a

16  walkway.

17   Q.  One campus?

18   A.  One campus.

19   Q.  All right.  Have you had any contact

20  with a man named Ralph Mohney, M-o-h-n-c-y?

21   A.  Have I ever talked to him?

22   Q.  Yes.

23   A.  No.

24   Q.  Do you know who he is?

Page 26

1   A.  Oh, I know who he is.

2   Q.  Who is he?

3   A.  He is a vice president in the

4  company.

5   Q.  Does he work in the Worcester office?

6   A.  No.

7   Q.  Where does he work?

8   A.  Chattanooga.

9       MR. TUCCI:  If you know.  Don't guess

10  if you don't know.

11   A.  Well, it would be an educated guess.

12   Q.  All right.  Now, the file on this

13  case, and I'm going to call it sometimes Doe and

14  sometimes Simon, I'll mix it up, indicates that

15  a man named Greg Breter was involved with this

16  file for awhile.  Have you ever had any cases

17  with Mr. Breter other than this one?

18   A.  I don't recall.

19   Q.  Okay.  Have you had any contact with

20  a woman named Tangela Johnson in connection with

21  this case?

22   A.  I think the phone records would speak

23  for themselves in that regard.  I do know that I

24  did try to contact her.  I don't know if I ever

Page 111

1  file would reflect any other resources that were
2  consulted.
3      Q.  When you say you consulted with
4  management, who in management did you consult
5  with?
6      A.  It would have been my manager at the
7  time, I believe that was Sandy Fryc.
8      Q.  Anybody other than her?
9      A.  I don't recall.
10     Q.  And you don't know whether you
11  consulted with legal or not?
12     A.  What I said was I don't recall if I
13  did or not.  I know with regard to some of the
14  other issues with this claim, I know we were
15  consulting with legal.  We do frequently consult
16  with legal on cases, so I don't recall
17  specifically if we did or did not.
18     Q.  Okay.  Who did you consult with at
19  Provident about the primary policy?
20     A.  I believe the claim representative at
21  that time was Greg Breter.
22     Q.  What form did your consultation with
23  Mr. Breter take?
24     A.  We talked on the phone, and I did ask

Page 110

1      A.  With regard to -- are you talking
2  about the decisions outlined in the November 8,
3  1998 letter?
4      Q.  Yes.
5      A.  That decision was made by myself in
6  conjunction with the resources available to me.
7  As to the extent it refers to the Provident or
8  John Hancock policies, it would have been in
9  conjunction with the individuals involved on
10  that end.
11     Q.  Okay.  So am I right that with
12  respect to the Paul Revere policy, the
13  determination that Dr. Simon was not qualified
14  for benefits was made by you?
15     A.  In conjunction with the resources
16  available to me, yes.
17     Q.  Okay.  And what resources did you
18  consult to reach that determination?
19     A.  At that point, I can say with some
20  level of certainty that I was consulting with
21  management on the file.  There may or may not
22  have been consultation with the legal
23  department, I don't recall.  Obviously the
24  medical input was in there, and basically the

Page 112

1  him to fax me some information from the policy.
2      Q.  Now, when the decision was made to
3  stop paying benefits on the Revere file, were
4  you the person that made that decision?
5      A.  I think I've already answered this
6  one.  Once again, with regard to the decision as
7  of November 1998, I was the claim representative
8  that would have made that decision in
9  conjunction with the resources available to me.
10     Q.  So you've consulted the resources
11  that you had to consult with.  But am I correct
12  that the final decision to pay or not to pay was
13  yours?
14     A.  Yes.
15     Q.  Okay.  And it was your decision with
16  respect to the Paul Revere policy?
17     A.  Yes.
18     Q.  Was the final decision to pay or not
19  to pay with respect to the Hancock and Provident
20  policies also yours?
21     A.  The Provident and John Hancock
22  policies were actually administered in the
23  Chattanooga office by different individuals.
24  Greg Breter was the claim rep at that time, and

Page 113

1 he would have been responsible for making the
2 decision. However, we were working together at
3 that point.
4     Q. Okay. There was a letter that issued
5 out of your office which referenced all three
6 policies. How was it determined that you would
7 write the termination letter on all three
8 policies?
9     A. As to the actual steps or
10 decision-making as to why it came out of
11 Worcester, I don't recall the specifics.
12 Thinking back on it, it makes sense because the
13 independent medical examination and the doctors
14 that were being referred to were in Worcester.
15 So since we were taking the lead, if you want to
16 call it that, on the claim, it would make sense
17 that it would be written out of our office.
18     Q. And were you taking the lead on the
19 claim for the other two policies as well as the
20 Revere policy?
21     A. No. What I referred to when I said
22 we were taking the lead is that since the
23 companies had combined, the company tries to
24 minimize the duplication of effort for the

Page 114

1 insured and for our administrative duties as
2 well. It makes things easier all around.
3     So rather than having Dr. Simon go
4 for an IME for Provident and have him go to an
5 IME for Paul Revere, he went to an IME, and that
6 was set up through Worcester, so that's what I
7 meant when I said I took the lead.
8     The actual administration of the
9 other policies were handled in their respective
10 locations.
11     Q. Did the IME reports that came to you
12 in the fall of '98 come to you? I mean, you
13 were the person who got Dr. Rosenberg's reports
14 and Dr. Hinkin's reports?
15     A. They did come to me through the claim
16 file, whether they were addressed to me or my
17 psychiatric claim manager, I don't recall.
18     Q. And you read those reports?
19     A. Yes, I did.
20     Q. And they were part of the facts that
21 you took into consideration in determining to
22 deny this claim?
23     A. Once again, we looked at all
24 information in the claim file, including the

Page 115

1 reports that were received.
2     Q. Did you then communicate to
3 Mr. Breter based on the IME and the claim file
4 these claims should be denied?
5     A. I don't recall the specifics of the
6 discussions that we had. I do know that we were
7 working together at that time.
8     Q. Did you make a recommendation to him
9 that the Revere -- that the Hancock and
10 Provident claims be denied?
11     A. I -- once again, I don't recall
12 specifics of the conversations that we had.
13 With regard to the information that had been
14 received, I would have looked at it in regard to
15 whether or not Dr. Simon qualified under the
16 Paul Revere policies.
17     As to the decisions for the John
18 Hancock and the Provident, those decisions were
19 Greg's to make, but we were working together, so
20 we were discussing the information that had been
21 received.
22     Q. During the course of that discussion,
23 did you recommend to him that those claims be
24 denied?

Page 116

1     A. Once again, the decisions on the
2 Provident and John Hancock claims were Greg
3 Breter's decisions to make after his evaluation.
4     Q. Did he seek a recommendation from
5 you?
6     A. I don't recall.
7     Q. And you don't recall whether you made
8 one?
9     A. I don't recall whether I made one or
10 not. But I can say once again, we were working
11 together, and my decision on the file was that
12 he didn't qualify for the Paul Revere benefit,
13 so whether or not that had any play in his
14 decision, you'd have to ask him, but we were
15 working together. He was aware of all the
16 information that we had.
17     Q. Did you tell Mr. Breter that as far
18 as you were concerned, Dr. Simon never qualified
19 for any benefits under this policy?
20     A. I don't recall specifics of any of
21 our conversations.
22     Q. Okay. Now, let me just make sure
23 that I have an understanding of the information
24 that you looked at. Okay, did you look at the

**Page 117**

1 records from the treating physicians?

2    A. We looked at all information in the

3 claim file.

4    Q. And you also looked at information

5 you got from your own staff and others?

6    A. We looked at all information in the

7 claim file.

8    Q. Okay. And you reached a conclusion

9 about Dr. Simon's claim, about whether it should

10 be paid?

11    A. We reached a conclusion --

12 determination as to whether or not he qualified

13 for benefits.

14    Q. Okay. And when you decide does he

15 qualify for benefits, are you making a decision

16 about whether he has a sickness under the policy

17 among other things?

18    A. When we determined whether or not he

19 qualifies for benefits, we are looking at the

20 provisions for which he could qualify for

21 benefits under. For example, the total

22 disability definition means that because of

23 injury or sickness, you are unable to perform

24 the important duties of your occupation, and

**Page 118**

1 then it goes on.

2    I know we did have -- we did indicate

3 in the November letter, we did reference the

4 sickness provision. If I could turn to it, I

5 could point it out to you, if you want.

6    Q. Sure. You got it there.

7    A. It's Part IV, I think. Yes, okay.

8 I'm sorry, your specific question again?

9    Q. Is your conclusion that he doesn't

10 qualify in effect your opinion about whether his

11 sickness prevents him from doing the important

12 duties of his occupation?

13    A. Okay. What I determined and I

14 alluded to in my letter of November of '98, I

15 indicate on page three of the letter that a

16 total disability is considered only when the

17 claimed condition manifests itself while the

18 policies are in force, and what that is

19 referring to is the definition of sickness in

20 his policy.

21    The definition of sickness in his

22 policy states or sickness means sickness or

23 disease which first manifests itself after the

24 date of issue and while your policy is in force,

**Page 119**

1 and then it goes on.

2    And what I was referring to is the

3 fact that Dr. Simon had been diagnosed with

4 generalized anxiety disorder, and he has

5 indicated that that did indeed manifest itself

6 prior to the issuance of his policy.

7    Also personality disorder, which

8 according to the Diagnostic and Statistical

9 Manual of Mental Disorders, the onset of a

10 personality disorder could be tracked back to at

11 least -- to adolescence or early adulthood. So

12 again, that was prior to the issuance of this

13 policy.

14    Q. So was it your conclusion that the

15 reason why Dr. Simon wasn't entitled to benefits

16 was because he had pre-existing conditions?

17    MR. TUCCI: Object to the form of the

18 question. Assumes there was a single reason.

19    A. I think the reasons for the denial of

20 Dr. Simon's claim have been outlined in the

21 November letter. In response to your question,

22 I will have to say that the diagnoses of

23 generalized anxiety disorder and personality

24 disorder are not considered sicknesses under his

**Page 120**

1 policy. Is that the only reason for denial?

2 No. He didn't qualify upon review of all the

3 information in the claim file.

4    Q. Okay. That was your decision that

5 you reached?

6    A. Yes.

7    Q. And is that because you concluded

8 that he was capable of performing the important

9 duties of his occupation?

10    A. We determined that Dr. Simon was

11 capable of performing the important duties of

12 his occupation.

13    Q. Okay. And in doing that, am I

14 correct that what you did was to make an

15 evaluation and a judgment about all of the

16 medical evidence in the file?

17    A. I think it oversimplifies the extent

18 of the investigation that we did on this

19 We had questions throughout the entire

20 we attempted to get answers to those qu

21 A lot of the questions met with uncoop

22 responses.

23    We requested medical records,

24 requested information from Dr. Simon

Page 121

1 obtained an IME. So all the information in the
2 claim file would be taken into consideration.
3     Q.  And is one of the things that you did
4 to make a judgment about the medical information
5 that was in the file, you decided that the
6 medical information was insufficient to support
7 what he needed to show to qualify for benefits?
8     A.  With regard to the medical evidence,
9 we looked at all the information that was
10 available.  If you're talking about when you say
11 you, if you mean me myself, obviously I'm not
12 medically trained, but we have resources
13 available to us that can answer any questions we
14 have.
15     Q.  The final decision to pay this claim
16 or not pay the claim, that wasn't made by a
17 doctor, was it?
18     A.  It was made by myself in consultation
19 with the resources that were available to me.
20     Q.  And part of that was a medical
21 decision?
22     A.  There were several medical opinions
23 in the file that we took into consideration.
24     Q.  And you had to weigh those and decide

Page 122

1 which ones you were going to give weight to and
2 which ones you were going to discount?
3     A.  I would disagree with that question
4 because it assumes we discounted medical
5 opinions, and we looked at all the medical
6 opinions that were provided to us.
7     Q.  And you took them all into account?
8     A.  Yes.
9     Q.  And you gave more weight to some and
10 less weight to others?
11     A.  No, I looked at all the information
12 that was available.
13     Q.  And you ultimately reached the
14 conclusion that he didn't have a covered
15 sickness?
16     A.  Could you repeat that last part?
17     Q.  You ultimately reached a conclusion
18 that he didn't have a covered sickness?
19     A.  We ultimately reached the conclusion
20 that he didn't qualify for disability benefits
21 under his policy.  And part of that reason was
22 because his diagnoses of generalized anxiety
23 disorder and personality disorder weren't
24 sicknesses under his policy.

```
1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF CONNECTICUT
2

3

4   JOHN DOE,
            Plaintiff,
5                                   Civil Action No.
    VS.                             3:00 CV-01096(SRU)
6
    UNUMPROVIDENT CORPORATION f/k/a
7   PROVIDENT COMPANIES, INC.,
    THE PAUL REVERE LIFE INSURANCE
8   COMPANY, PROVIDENT LIFE AND
    ACCIDENT INSURANCE COMPANY OF
9   AMERICA and JOHN HANCOCK MUTUAL
    LIFE INSURANCE COMPANY,
10          Defendants.

11

12

13

14       DEPOSITION of LINDA J. BRISSETTE taken at the

15   request of the Plaintiff pursuant to Rule 30 of

16   the Federal Rules of Civil Procedure before

17   Dianne G. Rutan, Registered Merit Reporter, a

18   notary public in and for the Commonwealth of

19   Massachusetts, on July 23, 2003, commencing at

20   9:05 A.M. at the offices of McCarthy Reporting

21   Service, 12 Harvard Street, Worcester,

22   Massachusetts.

23

24
```

```
                                          Page

1   A P P E A R A N C E S :

2

3   FOR THE PLAINTIFF:

4   JONATHAN KATZ, ESQ.
    JACOBS, GRUDBERG, BELT & DOW, P.C.
5   350 Orange Street
    New Haven, Connecticut  06503
6

7
    FOR THE DEFENDANTS:
8
    THEODORE J. TUCCI, ESQ.
9   ROBINSON & COLE, LLP
    280 Trumbull Street
10  Hartford, Connecticut 0610-3597

11       -and-

12  PATRICIA WILLIS, ESQ.
    UNUMPROVIDENT CORPORATION
13  18 Chestnut Street
    Worcester, Massachusetts  01608
14

15

16

17

18

19

20

21

22

23

24
```

Page 158

1    A. No.

2    Q. Did you ever participate in getting
3 ready for a roundtable review with respect to
4 Dr. Simon's claim?

5    A. Not to my recollection.

6    Q. Okay. At any time at Paul Revere,
7 did you regard yourself as having been placed
8 under any pressure to close claims?

9    A. No.

10    Q. Were you ever told to target your ten
11 biggest claims for roundtable review?

12    A. No.

13    Q. Did you ever participate in any
14 roundtable reviews with respect to any claims?

15    A. I participated in roundtable reviews.

16    Q. But not on this claim?

17    A. Not on this claim.

18    Q. Was it your experience that
19 roundtable reviews normally resulted in denials
20 of claims?

21    A. No.

22    Q. What did Mr. Breter discuss with you
23 concerning the roundtable review of Simon's
24 claim?

**Page 0001**

[01] IN THE UNITED STATES DISTRICT COURT
[02] FOR THE WESTERN DISTRICT OF TEXAS
[03] AUSTIN DIVISION
[04]
[05] CASE NUMBER: C.A. NO. A:98-CA-407-SS
[06] DR. LYNNE E. THOMPSON
[07]     Plaintiff,
[08]     vs.
[09] PROVIDENT LIFE AND ACCIDENT
[10] INSURANCE COMPANY,
[11]     Defendant.
[12]
[13] CASE NUMBER: C.A. NO. A: 98-CA-425-JN
[14] JOE L. WALLACE,
[15]     Plaintiff,
[16]     vs.
[17] PROVIDENT LIFE AND ACCIDENT
[18] INSURANCE COMPANY,
[19]     Defendant.
[20]
[21]     DEPOSITION OF DR. WILLIAM E. FEIST
[22]     In accordance with The Federal
[23] Rules of Civil Procedure, I, MICKEY TURNER,

**Page 0004**

[01] WILLIAM E. F     may be taken before MICKEY
[02] TURNER, Commissioner, at the offices of Foshee &
[03] Turner at 220 Park Place Tower, Birmingham,
[04] Alabama 35203, on the 25th day of January, 1999.
[05]     IT IS FURTHER STIPULATED AND AGREED
[06] that it shall not be necessary for any
[07] objections to be made by counsel to any
[08] questions except as to form or leading
[09] questions, and that counsel for the parties may
[10] make objections and assign grounds at the time
[11] of the trial, or at the time said deposition is
[12] offered in evidence, or prior thereto.
[13]     IT IS FURTHER STIPULATED AND AGREED
[14] that the notice of filing of the deposition by
[15] the Commissioner is waived.
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]

**Page 0002**

[01] am hereby delivering to Mr. David C. Kent,
[02] the original transcript of the oral
[03] testimony taken on the 25th day of January,
[04] 1999, along with exhibits.
[05]     Please be advised that this is
[06] the same and not retained by the Court Reporter,
[07] nor filed with the Court.

**Page 0005**

[01]     INDEX
[02] EXAMINATION BY:              PAGE NUMBER:
[03] Mr. Kent                          11
[04] Mr. Ehlinger                     113
[05] Mr. Davenport                   162
[06] Mr. Kent                         292
[07] Mr. Echerd                      337
[08] Mr. Kent                         340
[09]
[10] PLAINTIFF'S EXHIBITS:
[11] 1 - 4-24-95 Internal Memo          85
[12] 2 - 1997 Annual Report            157
[13] 4 - Securities And Exchange
[14]     Commission, Form 10-K         332
[15] 5 - Packet of Documents re:
[16]     Dr. Lynn Thompson's
[17]     Disability Claim               346
[18]
[19] DEFENDANT'S EXHIBITS:
[20] 3 - Provident Vision Statement    223
[21]
[22]
[23]

**Page 0003**

[01] IN THE UNITED STATES DISTRICT COURT
[02] FOR THE WESTERN DISTRICT OF TEXAS
[03] AUSTIN DIVISION
[04] CASE NUMBER: C.A. NO.:98-CA-407-SS
[05] DR. LYNNE E. THOMPSON
[06]     Plaintiff,
[07]     vs.
[08] PROVIDENT LIFE AND ACCIDENT
[09] INSURANCE COMPANY,
[10]     Defendant.
[11]
[12] CASE NUMBER: C.A. NO. A: 98-CA-425-JN
[13] JOE L. WALLACE,
[14]     Plaintiff,
[15]     vs.
[16] PROVIDENT LIFE AND ACCIDENT
[17] INSURANCE COMPANY,
[18]     Defendant.
[19]
[20]     S T I P U L A T I O N
[21]     IT IS STIPULATED AND AGREED by and
[22] between the parties through their respective
[23] counsel, that the video deposition of DR.

**Page 0006**

[01] IN THE UNITED STATES DISTRICT COURT
[02] FOR THE WESTERN DISTRICT OF TEXAS
[03] AUSTIN DIVISION
[04] CASE NUMBER: C.A. NO.:98-CA-407-SS
[05] DR. LYNNE E. THOMPSON
[06]     Plaintiff,
[07]     vs.
[08] PROVIDENT LIFE AND ACCIDENT
[09] INSURANCE COMPANY,
[10]     Defendant.
[11]
[12] CASE NUMBER: C.A. NO. A: 98-CA-425-JN
[13] JOE L. WALLACE,
[14]     Plaintiff,
[15]     vs.
[16] PROVIDENT LIFE AND ACCIDENT
[17] INSURANCE COMPANY,
[18]     Defendant.
[19] BEFORE:
[20] MICKEY TURNER, Commissioner
[21] APPEARANCES:
[22]     HUGHES & LUCE, LLP, by Mr. David C.
[23] Kent, 1717 Main Street, Suite 2800, Dallas,

[01]  Q. Where if someone is, is disabled
[02] because they are depressed, the fact
[03] that they are getting disability benefits
[04] presents with the secondary gain and prohibits
[05] them from getting better?
[06]  A. I am fully aware of that concept,
[07] yes, sir.
[08]  Q. Also, Dr. Feist, you are aware,
[09] generally, that under the Provident policies, an
[10] insured has an obligation to be under the
[11] regular care and attendance of a duly qualified
[12] physician for any period of time they are on
[13] claim?
[14]  A. Oh, absolutely. That's a given.
[15]  Q. And the purpose of that clause in the
[16] policy is to make sure that the insured gets
[17] treatment and hopefully gets well?
[18]  A. Sure. That's the whole point of it.
[19]  Q. You don't take any issue with that?
[20]  A. I do not.
[21]  Q. Let's talk about the claims that were
[22] submitted to the round-table review while you,
[23] while you were there. And, again, this is the

## Page 0242

[01] period between April of '95 and February of '96.
[02] Would it be a fair statement that not every
[03] claim involves a reserve of in excess of a
[04] million dollars?
[05]  A. I'm sure that's true. I can't recall
[06] specifically, but, obviously, you've researched
[07] that and that's probably true.
[08]  Q. Would it be a fair statement that not
[09] every claim involved a situation where an
[10] insured had been on claim for a long period of
[11] time?
[12]  A. I'm sure that has happened, but it
[13] seems that would not be common.
[14]  Q. Would it be a fair statement that
[15] with regard to a majority of the round-table
[16] reviews, you did not think the company did
[17] anything improper?
[18]  A. That's probably a fair statement,
[19] yeah.
[20]  Q. As I understand it, you don't have a
[21] problem with the fact that a claims
[22] representative could have a legitimate question
[23] and bring the case to a round-table review?

## Page 0243

[01] You don't find anything --
[02]  A. No, not at all.
[03]  Q. In your prior deposition, I believe
[04] you told us that the claim representatives have
[05] a duty to actually do that if they don't feel a
[06] claim is payable pursuant to a policy. They
[07] have a duty to seek help.
[08]  A. That's what they are hired by the
[09] company to do. That's their job.
[10]  Q. In every claim that you saw during
[11] the round-table review, the claims
[12] representative had raised a question as to
[13] whether the claim was payable for some reason or
[14] another?
[15]  A. Indeed, yes.
[16]  Q. And the issues as to why the claim,
[17] the questions that the claims representative
[18] had, were they then discussed at the meeting?
[19]  A. Yes, that was the point of the
[20] meeting.
[21]  Q. All right. Now, do you have any
[22] specific recollection, as you sit here today, of
[23] the details of any claim that was discussed?

[01]  A. I do.
[02]  Q. Well, I'm not purporting to tell
[03] this jury that Ralph Mohney came in and said,
[04] "Guys, we have got this claim reserved at X
[05] dollars. I don't care what the facts show. I
[06] don't care what the medicine shows. We just
[07] want to cut this claimant off." Did he ever say
[08] that?
[09]  A. Not in so many words, but --
[10]  Q. Did he ever say that or words to that
[11] effect?
[12]  A. No. No, he did not.
[13]  Q. After the questions were discussed
[14] as I listened to you, you said that a number of
[15] things could happen. The first thing that could
[16] happen, the decision could go in favor of the
[17] insured. The question could be answered and the
[18] claim in the insured's favor, the decision would
[19] be reached to continue payment of the claim,
[20] look at it another day?
[21]  A. Yeah.
[22]  Q. That happened, in fact, on
[23] situations, did it not?

## Page 0245

[01]  A. Oh, I'm sure it did, yes, of course.
[02]  Q. And again, whether the claim was
[03] payable or not, that's not solely a medical
[04] question; there may be legal issues involved?
[05]  A. Many issues, yes, sir.
[06]  Q. For example, somebody could be
[07] medically disabled, in other words, have a
[08] condition that shows they are medically
[09] disabled, but the claim could not be legally
[10] payable for some reason under the contract?
[11]  A. Indeed.
[12]  Q. For example, the illness could have
[13] manifested itself before the contract was
[14] issued?
[15]  A. Oh, yeah, preexisting. Of course.
[16]  Q. Okay. So there could be legal
[17] reasons why a claim wouldn't be payable even if
[18] it was medically justified?
[19]  A. Oh, indeed.
[20]  Q. All right. Now, or the company after
[21] they heard everything could say, we are just
[22] going to deny the claim; the claim needs to be
[23] denied and should not have been paid?

## Page 0246

[01]  A. If they had valid reason to do so,
[02] that's within their prerogative.
[03]  Q. On some occasions, did that, in fact,
[04] happen, after round-table review a decision was
[05] reached to deny the claim?
[06]  A. It apparently was. I don't have
[07] statistics on the number, but I'm sure that
[08] happened.
[09]  Q. But you don't remember the
[10] statistics, though?
[11]  A. No, sir, I do not.
[12]  Q. But isn't it a fact, Doctor, that in
[13] the great bulk of the questionable claims that
[14] were presented for round-table review when you
[15] were there, the decision was made to go get some
[16] additional information?
[17]  A. I think that's a fair statement. The
[18] great majority of them were, yes.
[19]  Q. So at the end of the day, the people
[20] gave input and they said, "Okay, here's what you
[21] need do, we need more information"?
[22]  A. Uh-huh (indicating affirmatively).
[23]  Q. For example, send a questionnaire to

## DISABILITY CLAIM DEPARTME
*Management / Consultant Referral Form*

4-23-98

To: Brian D.                    Insured: David Simon

From: Greg B.                   Claim No: 47-872483
                                          06-871972

**REASON FOR REFERRAL:**

per roundtable discussion:

RECOMMENDATIONS: ① coordinate activities with Worcester claim rep ② addendum reviews by IME physicians of all new claim information ③ review of occupational activity by AP ④ surveillance for one week ⑤ Follow-up with cheryl Jariz whose insured was under Dr. Simon's care.

MANAGEMENT/CONSULTANT COMMENTS: agree —
B.Donnelly
5/12/98

Would also get copies of the two articles written by Insured and listed under medical reference (attached).

PLACL00593

To: Brian Donnelly          Insured: David Simon

From: Greg Breter          Claim No: 06-871972

**REASON FOR REFERRAL:**

Per Round Table Discussion — careful comparison of job descriptions.

**RECOMMENDATIONS:** Have our clinicians contact the AP regarding restrictions & limitations — why he can do one and not the other.

**MANAGEMENT/CONSULTANT COMMENTS:**

agree —
BDonnelly
6/5/98

PLACL00592